## PALMER v. MAHIN et al.

### (Circuit Court of Appeals, Eighth Circuit. February 17, 1903.)

### No. 1,744.

1. LIBEL—WHAT CHARGES ARE LIBELOUS PER SE—COMPENSATORY DAMAGES.

An unprivileged publication, in writing or print, of a false charge that another is guilty of a crime, or of a false charge that tends to expose another to public hatred or contempt, is libelous per se; and such a publication entitles the victim of the libel to full compensation for the damages to his reputation, business, and feelings which it has caused, regardless of the intent or motive with which the publication was made.

2. SAME—SUCH A PUBLICATION RAISES CONCLUSIVE PRESUMPTION OF DAMAGES, AND THE ONLY QUESTION FOR THE JURY IS THE AMOUNT.

The unprivileged publication of such charges raises a conclusive legal presumption that the victim has sustained some damages, and the only question for the jury is their amount.

3. SAME—CHARGE OF BLACKMAILING AND EXTORTION.

The charge that one is a blackmailer, and has brought blackmailing suits to extort money wrongfully, is libelous on its face. So is the charge of inducing the publication of a libel in order to found suits upon it to extort money wrongfully.

4. SAME—EXEMPLARY DAMAGES—WHEN ALLOWABLE.

In addition to compensation for his actual loss, the jury may allow to the victim of a libel exemplary damages when the publication was inspired by ill will or by a willful intent to injure, or was made in violation and in reckless disregard of the rights of the person defamed.

5. SAME—MATTER IN MITIGATION—WHEN ADMISSIBLE.

The publisher of such a libel may plead and prove that when he sent it forth he believed the statements it contained to be true, that he was then innocent of any intent to injure, or of any ill will towards his victim, or that he made the publication by mistake or inadvertently, for the purpose of mitigating the exemplary damages. But matter in mitigation of damages for the unprivileged publication of a libel is inadmissible to reduce or affect the compensatory damages to which the person defamed is entitled, because these damages are the same, whatever the motive, intent, or care with which the publication was made.

6. SAME—MITIGATION OF DAMAGES—TESTIMONY.

It is incompetent for the publisher of a libel to testify, in mitigation of damages, that he believed he was justified in making the publication, and that he made it for the public good.

7. SAME—COMPENSATORY DAMAGES—INFORMATION RECEIVED FROM ANOTHER.

The fact that the information from which an unprivileged publication was made was derived from another, and that the name of the informant was stated in the libel, is no justification for its publication, and no defense to a claim for compensatory damages therefor.

8. SAME—RETRACTION—PUBLICATION OF DENIAL OF VICTIM IS NOT.

A retraction of a charge is a withdrawal of it by the party who made it. The publication of a statement that the victim of a libelous charge denies it is not a retraction of it.

9. SAME—EVIDENCE—SUBPŒNA FOR SUBSCRIPTION LISTS TO PROVE DAMAGES.

It is always competent for the plaintiff in a libel suit to prove the extent and locality of the circulation of the newspaper which published it. The shipping, mailing, and subscription lists, and the proper account books, of the proprietor of such a newspaper, constitute the best

¶ 3. See Libel and Slander, vol. 32, Cent. Dig. § 34.

¶ 5. Mitigation of damages in libel and slander cases, see note to Sun Printing & Publishing Ass'n v. Schenck, 40 C. C. A. 168.

evidence of these facts; and, upon proper affidavit of the materiality and necessity thereof, the plaintiff is entitled to a subpœna duces tecum, directed to the person in control of this evidence, commanding him to produce it at the trial.

**10. SAME—EVIDENCE OF FALSITY OF CHARGES.**

While, in the absence of a plea of justification, the plaintiff is entitled to recover without proof of the falsity of the charges, he has the right to make that proof, because only in this way can the difference between a technical misstatement and a cruel and irremediable falsehood be shown, and the proper measure of damages applied.

**11. SAME—CHARGE OF BLACKMAIL—BUSINESS AND INTENT OF PLAINTIFF ADMISSIBLE TO REBUT.**

Where the plaintiff is charged with bringing blackmailing libel suits, it is competent for him to prove his business, reputation, and standing when the libel which was the foundation of those suits was published, the effect of its publication upon his reputation, business, and feelings, and his acts when he learned of the publication, because this evidence tends to show the basis of the suits, and the intent of the plaintiff in bringing them.

**12. SAME—MATTER IN MITIGATION—INTENT.**

Nothing is competent to show the intent of the defendant in publishing a libel for the purpose of mitigating the damages which was not known to the libeler when he made the publication.

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the Southern District of Iowa.

On October 3, 1892, John Mahin published in the Evening Journal, a newspaper of which he was the editor and publisher, at Muscatine, in the state of Iowa, an article which charged that Tyndale Palmer had robbed his employers; that he was an embezzler to the tune of $440,000; that he, in company with one Freitas, had sold patents of his employer for $510,000, had reported the sale of them for $80,000, and had retained $10,000 of this amount as his salary, and all the difference between $80,000 and $510,000. These charges were false. On November 27, 1893, Palmer wrote to Mahin that the charges in the article he had published were absolutely false, asked of him a retraction and reparation, and informed him that he would submit the proofs of the falsity of the charges to his inspection upon his agreeing to make satisfactory retraction and settlement if the evidence proved unequivocally that the charges were not true.

Mahin did not answer this letter, but on January 27, 1894, he copied into his newspaper an article from the Ottumwa Courier, which had published the libelous article of October 3, 1892, in which the statement was made that Mr. Palmer had written to that paper that the charges in the article of October 3, 1892, were absolutely false, and that he was prepared to offer conclusive proof that they were not true; that this matter came to the Courier as an item of telegraphic news, and it knew nothing about it, beyond the facts it had stated; and that, if an injustice had been done, it regretted the same, and suggested that Mr. Palmer turn his attention to the news agency that sent the matter to the newspapers. At the foot of this copied article Mr. Mahin added in his Journal that that paper was substantially in the same boat as the Courier; that it did not, however, like the blackmailing tone of Palmer's letter; that he wanted the Journal to give him a financial salve for his hurt; that it was not in that kind of business; that it never intended to do injustice to any one; and that, when it was shown that injustice had been done, it would be found prompt to make amends, but not quite so prompt when threatened with a suit as when without it.

On July 10, 1894, Palmer wrote to Mahin that he was prepared to demonstrate to him that the charges of October 3, 1892, were unfounded; that the time had come when he must complete arrangements to commence an action in order to avoid the statute of limitations; that the financial loss

caused him by the publication was serious, but that he did not expect any one newspaper to pay more than its due proportion; that he was ready to adjust the case outside the courts; that the only basis of settlement on which he could meet any paper was just reparation and unequivocal retraction; that, if Mahin would recognize that basis, he would meet him in a most reasonable and liberal spirit; and that, if they were unable to agree, he suggested a reference of the entire matter to arbitration. On July 17, 1894, Mahin answered that the matter complained of came to him in plates from Kellogg, of Chicago; that the plates were inserted in his paper, without inspection, as soon as received; that he knew nothing about it, and had no intent to do any injustice to any one, and that as soon as he heard from Palmer he gave his denial to his readers; and that Palmer would never get a cent of money out of his paper unless he got it at the end of·a lawsuit. Thereupon, on October 1, 1894, Palmer commenced an action against the Journal Printing Company, the alleged proprietor of the Evening Journal, for $50,000 damages for its publication of the article of October 3, 1892. On April 25, 1895, that action was dismissed, without prejudice, for want of prosecution.

On October 1, 1894, Mahin published in his Evening Journal a long article, now in suit, which stated the fact that the Journal Printing Company had been sued for $50,000 by Palmer and Freitas on account of the publication of the article of October 3, 1892; that the Journal Company was innocent of intentional slander of the plaintiffs in those actions; that the matter was supplied by the Kellogg Company, and was published without scrutiny; that, as soon as Palmer informed it that the charges were false, it gave him the benefit of his denial in its paper, and it disavowed any intention to do him an injury. That article also contained these statements: "We knew nothing about him then, and were willing to accept his statement that he was an honest but injured man. We know more of him now. His subsequent conduct, and especially the bringing of suit, satisfies us that he is a blackmailer; and we would not be surprised if it should transpire that he was the means of having the report concerning himself put into the press dispatches for the express purpose of going around as he is now doing, extorting money by threats of suing the papers which published the report. * * * We are glad to know that no respectable attorney in Muscatine would have anything to do with these blackmailing cases, though some were solicited. The attorney who has them in charge should be disbarred for unprofessional conduct. He must know that the suits are intended only to force money from the respondent on the theory of a compromise before they come to issue. * * * We understand that several other papers in Iowa have been served with notices of suits by this precious pair. The Keokuk Constitution is one, and, if we mistake not, the Waterloo Courier and Ottumwa Courier are also in the list. In all these papers a Philadelphia dispatch appeared, stating, in effect, that Palmer and Freitas, while acting as agents of the Auer Incandescent Light Company in South America, had embezzled $440,000 of its funds; this being, as alleged, the difference in the amount of sale of the company's franchise and the amount which they reported to their employers."

On April 25, 1895, Mahin published an article in his Evening Journal which stated that the suits of Palmer and Freitas against the Journal Printing Company had been dismissed, rehearsed some of the statements of the article of October 1, 1894, relative to the circumstances of the publication of the article of October 3, 1892, and contained this statement: "As will be remembered, the Journal, on being served with notice of the suit, published an article referring to the case, expressing surprise that an attorney could be found in Muscatine who would take the case, denouncing it as a blackmailing scheme, whereupon Warner amended, and added $10,000 more in each case."

On April 26, 1895, Mahin published another article, devoted largely to the discussion of a publication in the News Tribune relating to the dismissal of Palmer's action against the Journal Printing Company on the day before. This article contained these statements: "The News Tribune seems to be unhappy over the fact that the Journal Printing Company was not made the victim of the Tyndale Palmer blackmailing scheme." The article then pro-

ceeded to state that the News Tribune had taken the view that the action against the Journal Printing Company had been dismissed too quickly, and before the plaintiff had received a proper opportunity to oppose its dismissal. The article then continued: "This is the News Tribune's version of the affair, evidently furnished by one of the attorneys in this blackmailing case. As a matter of fact, however, the case was never intended to come to trial. There was nothing in it to maintain an honest action. All that was intended was harassment, with the hope of extorting money from the defendant in the way of a compromise. This is the view the Journal took of it from the beginning. * * * Meanwhile we must express our surprise that the News Tribune, or any other newspaper, for that matter, would show any sort of sympathy for one who would undertake, as Palmer has done, to levy blackmail on the press of the country. His methods are such that, if they should be successful, they would virtually put the newspapers of the country at the mercy of the most unscrupulous adventurers."

On March 9, 1897, Mahin published an article in his Evening Journal which contained a telegraphic dispatch to the effect that an action for libel brought by Palmer against the Youngstown Vindicator had been dismissed, and that the costs therein had been assessed against the plaintiff. The article contained these comments upon this dispatch: "The above is the right way to dispose of such cases. There ought, however, to be a way to prevent suits being instituted when it is plain, as has been in the Tyndale Palmer case, that the sole purpose is to wrongfully extort money, not to secure justice or vindication, because in these cases it was expressly stated that retraction would not be accepted as satisfaction, but a money salve must be applied. Clerks of courts or judges should have the right to reject feigned cases or blackmailing suits, and thus save innocent defendants from costs incident to employing attorneys, besides other expenses and a great deal of unnecessary harassment."

On September 26, 1896, Palmer brought an action in the court below against John Mahin, the editor and publisher of the Evening Journal, for the composition and publication therein of the articles of October 1, 1894, April 25, 1895, and April 26, 1895. On March 2, 1899, he commenced an action against John Mahin, the editor and publisher, and the Journal Printing Company, a corporation, the proprietor of the Evening Journal, for $20,000 damages for the publication of the article of March 9, 1897. Mahin answered the petition against him on September 27, 1898, with a general denial, a denial of damages, and an averment that he made all the publications in his paper in good faith, upon information received from what he believed to be a reputable and responsible source, and without any intention to injure anybody. On April 22, 1899, the defendants in the second action entered a general denial, and the cases stood upon these issues until the day before they were set for trial, when, on motion of the defendants, they were permitted to file amended answers. These amended answers contained no plea of justification—no denials of anything except a questionable denial of publication and ill will. They consisted, substantially, of allegations in mitigation of damages, to the effect that the original article of October 3, 1892, was published innocently, upon information received from sources upon which the defendants believed they had a right to rely; that they had made a retraction; that they subsequently learned that the plaintiff, together with one Dove, an attorney, and one Freitas, had organized a scheme to have more than 300 suits brought against the newspapers which had published the article of October 3, 1892, for the purpose of recovering damages aggregating several millions of dollars; that special effort was to be made against the newspapers published in small towns, such as Muscatine, to compel their publishers to pay money for the alleged injury to the plaintiff; that Palmer, through his attorney, wrote circular letters to attorneys throughout the state of Iowa, in which he sought to employ them on a contingent fee, and to induce them to procure a republication of the original libel; and that, from the information which they received, they believed they were justified in writing the articles upon which the actions are founded, and in that belief they had written them. The two cases were consolidated, were tried together upon the issues which these pleadings presented, and there were verdicts and judgments for the defend-

ants. The writ of error which presents them to this court questions the rulings of the Circuit Court in the course of the proceedings which led to this result.

John E. Craig (Tyndale Palmer, on the brief), for plaintiff in error.

William McNett (James C. Davis, on the brief), for defendants in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The unprivileged publication, in writing or print, of a false charge that another is guilty of a crime, or of a false charge which tends to expose another to public hatred or contempt, entitles the person thus defamed to recover of the publisher full compensation in damages for all the injury to his reputation, business, and feelings which the defamatory publication caused. A written or printed article of this character is libelous in itself. From its publication the conclusive presumption of actual damages to its victim, and of legal malice, that is to say, of "an act done wrongfully, without legal justification or excuse," at once arises. The fact that the publisher was without malice in the popular acceptation of that term, that is to say, without ill will, bad motive, hatred, or intent to injure his victim, constitutes no defense to the latter's claim for compensatory damages, and no evidence to mitigate or reduce their amount, because the actual damages to the party libeled are the same whether they are inflicted by the publisher with a good or an evil intent, and the victim is as clearly entitled to full compensation for a wrong inflicted with a laudable motive, or through mistake or inadvertence, as from one perpetrated with a diabolical purpose or intent. The intent or purpose with which such a publication is made is immaterial in the trial of the claim for the actual or compensatory damages which the party injured may seek. It is important only when a claim for exemplary damages is to be considered.

In addition to fair compensation for the injury caused to his business, reputation, and feelings which one thus libeled is entitled to recover, regardless of the motive, purpose, or intent of the publisher, a jury is empowered to allow exemplary or punitive damages to the person defamed when the publication was made with ill will, or with a willful intent to injure the victim, or in violation and in reckless disregard of his rights and feelings. In mitigaton of these exemplary damages, the publisher may plead and prove that he was actuated by no evil intent, no ill will, no purpose to injure the victim of his publication, when he sent it forth; that when he made the publication he knew certain facts which reasonably tended to show that the charges he made were true; and that, in reliance upon these facts, he published the charges in that belief, or that they were published by mistake or through excusable inadvertence. But this matter in mitigation affects the exemplary damages only.

A statement of these and many other rules and principles of the law applicable to the case in hand, together with the reasons and authorities sustaining them, may be found in the cases of the Times Publishing Co. v. Carlisle, and the Journal Co. v. Carlisle, 94 Fed. 762, 36 C. C. A. 475. The sharpness and persistence of the contests in those cases, the importance of that litigation and of the questions it involved, and the careful and exhaustive arguments of the learned and eminent counsel who represented the respective parties to it, led to a deliberate and thoughtful consideration by this court of the crucial questions which conditioned the decision of those cases, and of many of the general rules and principles that govern the administration of the law of libel. It is sufficient now to refer to the opinion in those cases for a discussion of these rules, and of the reasons and authorities which sustain them, without repeating it here, and we turn to the application of the principles there announced to the facts of the case in hand.

On October 3, 1892, the defendant Mahin published in his newspaper the false charge that the plaintiff, Palmer, and his associate, Freitas, had robbed Palmer's employer, and had embezzled $440,000 of the latter's money. The moment that charge was published, a perfect and indefensible cause of action to recover of the publisher fair compensation for all the injury which that publication caused to the reputation, business, and feelings of its victim accrued to Palmer, and a conclusive presumption of law arose that he had sustained damages in some amount. Whether there also arose a cause of action for exemplary damages, or the fact that the charges made in that article were received in plates from Kellogg & Co., and were inserted by the defendant Mahin without scrutiny, would have defeated a recovery of damages of this character, is not material to the questions in issue in the case that is now before us. The fact that they were published by mistake and without examination constituted no defense to Palmer's cause of action for his actual damages in that case, and no evidence in mitigation of those damages in any event. It is no justification for the publication of a libel, and no defense, in whole or in part, to a claim for compensatory damages for the injury caused thereby, that another had previously written or published the charge, and that the libeler merely repeated it. Times Pub. Co. v. Carlisle, 94 Fed. 762, 767, 36 C. C. A. 475, 480; Sans v. Joerris, 14 Wis. 666; Inman v. Foster, 8 Wend. 602; Odgers, Libel & Slander, p. 124. Palmer wrote to the defendant Mahin that the charges contained in the article of October 3, 1892, were false, and that his publication of them had inflicted injury upon him, and demanded reparation and retraction. He had a legal right to reparation—to compensation for the injury which the publication had inflicted upon him—and the legal duty was imposed upon the defendant Mahin to make this reparation. He refused to do so, and published in his newspaper a statement that Palmer had denied the charges, and had offered to submit to him conclusive documentary proof of their falsity. Palmer subsequently commenced an action against the Journal Printing Company for $50,000 damages for the publication of this libel. This action was subsequently dismissed without prejudice, and is not here for our considera-

tion. The first of the articles which are the subject of this litigation was published on October 1, 1894, and this was the situation of the parties when that publication was made: Mahin had published charges against the plaintiff that were libelous per se. Palmer had brought an action against the printing company for the damages he had sustained thereby. The publisher of the libel was without defense to Palmer's claim for compensatory damages, at least.

Let us turn now to the trial of the actions that are before us for consideration. As these actions were tried together by consent of the parties to them, and as the difference in the liability of the two defendants, if any, is immaterial to the consideration and decision of the crucial questions which must determine the issue before us, no attempt will be made in this opinion to distinguish between them, but this case will be discussed as though each of the defendants was liable for the publication of all the articles. When these actions came on for trial, the complainants alleged and the answers admitted that the defendants had written, and the proof was plenary that they had published, without any justification for so doing, the false charges which are found in the articles of October 1, 1894, April 25, 1895, April 26, 1895, and March 9, 1897, and which are set forth at length in the statement which precedes this opinion. These charges were, in effect, (1) that Palmer's conduct satisfied the defendants that he was a blackmailer; that the actions which he had brought against the Journal Printing Company and the proprietors of other newspapers which had published the original libel of October 3, 1892, were black-mailing cases; that there was nothing in the case against the Journal Printing Company to maintain an honest action; that Palmer had undertaken to levy blackmail on the press of the country; and that the sole purpose of his suits to recover damages for the publication of the original libel was "to wrongfully extort money, not to secure justice or vindication"; (2) that they would not be surprised if it should transpire that he was the means of having the reports concerning himself, upon which this libel was based, put into the press dispatches for the express purpose of going around extorting money, as he was then doing, by threats of suing the papers which published the report; and (3) that in the Keokuk Constitution, the Waterloo Courier, and the Ottumwa Courier a Philadelphia dispatch appeared, stating, in effect, that "Palmer and Freitas, while acting as agents of the Auer Incandescent Light Company in South America, had embezzled $440,000 of its funds; this being, as alleged, the difference in the amount of sale of the company's franchise and the amount which they reported to their employers." The legal effect of the allegations of these complaints was that the defendants had republished the original libel, and that they had published charges that Palmer was a blackmailer; that he was guilty of wrongfully extorting money by threats of baseless suits; and that he might have caused the telegraphic dispatch which was the foundation of the original libel to be inserted in the press dispatches for the purpose of laying the foundation for the practice of this extortion.

The articles in which these charges are contained are voluminous. All their parts have been thoughtfully considered together, and each

one of the articles has been studied separately, for the purpose of determining what those who read them must have understood from all the statements they contained. · These articles have been carefully read and searched throughout, again and again, in vain, to find anything in any of them to indicate that the terms in which these charges were made were used in a Pickwickian sense, that they were not intended to convey their ordinary meaning, and that they might have been understood by those who read them in some other way than as accusing the plaintiff of embezzlement, extortion, and procuring the publication of the original libel in order to furnish the opportunity for the extortion; and this court is unanimously of the opinion that neither the articles themselves, nor the facts and circumstances surrounding their publication, contain any evidence whatever from which the deduction can be lawfully drawn that these publications were intended to convey any other meaning, or that they could have been understood by those who perused them in any other sense. They were therefore libelous in themselves. They charged the plaintiff with the crime of extortion and embezzlement, and tended to expose him to public hatred and contempt.

The answers of the defendants contain no denial of the writing of these accusations; no denial that they were false; no plea of justification; no allegation, even, that the defendants believed the charges to be true when they published them; nothing but matter in mitigation of damages, which was material only in measuring the amount of exemplary damages to which the plaintiff might be entitled, and a technical denial of ill will and of the publication.

It inevitably follows that at the trial the plaintiff was entitled, upon the face of the pleadings and proof, to a judgment against the defendants for such an amount as would compensate him for the injury he had actually sustained by reason of the defamatory publications. The libelous character of these articles raised the conclusive presumption that he had sustained some damages, but left their amount for the consideration of the jury.

In addition to these compensatory damages, the plaintiff was entitled to recover such an amount of exemplary damages as the jury, in their discretion, might allow, after they had considered the competent evidence of the intent and purpose of the defendants in publishing the articles, and the matter in mitigation of the punitive damages which the defendants might lawfully introduce. The republication of the false charges in the original libel, and the publication of the false statements that Palmer's well-founded actions for damages for the original publication were baseless and blackmailing cases, after he had notified the defendants by letter and by an action against the Journal Printing Company that the original accusations were not true, furnished ample evidence to compel the trial court to submit to the jury the question of punitive damages. When the trial came on, and the publication was proved, there was no defense to a recovery by the plaintiff of all the actual damages he had sustained, and the only issues for the jury to determine were (1) the amount of damages which would compensate the plaintiff for the injury to his reputation, business, and feelings which the publication of the articles described in the

complaints had caused; and (2) whether or not they should allow exemplary damages, and, if so, in what amount. A careful review of the proceedings in these cases, as they are portrayed in the record before us, in view of the issues open to the consideration of the jury, and in the light of the legal principles adverted to in the earlier part of this opinion, has forced us to the conclusion that the learned court below fell into error in some of its rulings, to which brief reference will now be made.

It submitted to the jury the question whether or not the publications were libelous, and allowed them to determine that they were not so, and to return verdicts for the defendants on that ground, when the articles were clearly libelous upon their faces, and the court should· have so instructed the jury, and should have farther charged them that the plaintiff was entitled to their verdict for compensatory damages, and that the only question for their consideration was the amount of the damages to be allowed.

It refused to instruct the jury, as requested. by the plaintiff, that the publication contained in the article of October 1, 1894, of the statement that "we should not be surprised if it should transpire that he was the means of having the report concerning himself put into the press dispatches for the express purpose of going around, as he is now doing, extorting money by threats of suing papers which published the reports," was libelous per se, when it should have so charged, because that statement contains matter tending to expose the plaintiff to public hatred and contempt, and accuses him of the crime of extortion.

It refused to charge the jury, as requested by the plaintiff, that the defendant Mahin was liable for compensatory damages, and might be liable for punitive damages, for publishing in the article of October 1, 1894, the original charge, in these words: "In all these papers [certain papers, mentioned in the article, which Palmer had sued] a Philadelphia dispatch had appeared, stating, in effect, that Palmer and Freitas, while acting as agents of the Auer Incandescent Light Company in South America, had embezzled $440,000 of its funds; this being, as alleged, the difference in the amount of sale of the company's franchise and the amount which they reported to their employers"—when it should have given the instruction requested. The statement which has been quoted neither was, nor did it purport to be, a narration of any judicial proceeding, so that it was not a privileged communication upon that ground, as claimed by counsel for the defendants. It appeared to be, and in fact was, a statement of an alleged occurrence, not in any court, but in the places of publication of certain newspapers before any judicial proceedings were instituted. The fact that the republication of the old libel was preceded by a statement of its alleged source was no justification for its publication. Injury to a fair reputation by the repetition of a libel and the mention of the name of an earlier libeler is indefensible. Times Pub Co. v. Carlisle, 94 Fed. 762, 767, 36 C. C. A. 475, 480.

Moreover, the fact that the defendant Mahin published this charge of embezzlement after he had been notified by a letter and by a suit

that it was not true is such persuasive evidence of ill will toward and of an intent to injure the plaintiff as to warrant the submission to the jury, under proper instructions, of the question of the allowance of exemplary damages.

The court refused to instruct the jury, as requested by the plaintiff, to the effect that a retraction is the withdrawal of a charge; that a statement by the libeler that the victim denies the charge is not a retraction; that the article of January 27, 1894, did not constitute a retraction of the original charge; and that this article might be considered on the question of malice—when such an instruction was fully warranted by the facts of the case.

The court denied the application of the plaintiff for a subpœna duces tecum to Harold Mahin, commanding him to produce in evidence at the trial the mailing lists, subscription lists, shipping lists, books, records, and accounts of the defendants which showed the extent and the places of the circulation of the Muscatine Evening Journal during the years 1892, 1894, 1895, and 1897, when these articles were published, when it should have granted that application. The motion was founded on an affidavit of counsel for the plaintiff that Harold Mahin was in possession and control of these papers and books, and that they were material and necessary for the trial of the case. Their materiality and necessity in order to prove the plaintiff's damages are evident from the pleadings themselves. He was entitled, in any event, to such damages as would fairly compensate him for the injury he had suffered from the publication of the articles in the Evening Journal. The extent of that injury was conditioned by the extent and by the locality of the circulation of the newspaper which published them. The shipping, mailing, and subscription lists of that paper, and its books of account with its subscribers, constituted the best, and probably the only definite, evidence of these facts. In actions for libel by publications in a newspaper, it is always competent for the plaintiff to prove the extent to which, and the locality in which, the paper containing the publications circulated. Locke v. Chicago Chronicle Co., 107 Iowa, 390, 78 N. W. 49; Bigelow v. Sprague, 140 Mass. 425, 5 N. E. 144. And the circuit court had ample power to issue the subpœna sought, under the act of conformity (Rev. St. § 914 [U. S. Comp. St. 1901, p. 684]) and sections 4658 and 4659 of the Code of Iowa of 1897.

The court ruled out competent evidence offered by the plaintiff, tending to show the extent and character of his business shortly before and at the time of the publication of the libel of 1892, and the effect of that publication upon his reputation and his business, when this evidence was material and admissible. The defendants had charged in their newspaper that the actions which the plaintiff had brought on account of the publication of October 3, 1892, were blackmailing suits, instituted to extort money wrongfully. It is true that the answers in these cases admitted the falsity of those charges, and that it was not necessary to the maintenance of his actions that the plaintiff should prove this fact. But he had the right to do so, and the evidence which he offered had a direct tendency to show that the actions he brought for the earlier publication were not blackmailing

suits, but were founded upon causes of action well grounded in law and in fact. While it is not necessary for a plaintiff to prove the falsity of libelous charges when there is no plea of justification, it is always competent for him to do so, to enhance the damages, for it is only thus that the essential character of the publication may be seen, and the difference between a technical and all but harmless misstatement and a cruel and irremediable falsehood may be distinguished, and the proper measure of damages applied. Malloy v. Bennett (C. C.) 15 Fed. 371; Press Pub. Co. v. McDonald, 73 Fed. 440, 443, 19 C. C. A. 516, 519.

For the same reason the court erred in excluding the testimony of the plaintiff describing the course he pursued and the acts he did in seeking to ferret out the source of this original libel, and to save his business and vindicate his character, when he learned of its publication. When the defendants charged that the plaintiff was a blackmailer, and that he was guilty of extortion in commencing his earlier actions for the original libel, and intimated that he might have provided the opportunity to practice this extortion, they assailed his intent—his good faith—and he had the right to produce and to submit to the jury any evidence which reasonably tended to show that he acted in good faith, with the intention to do no more than to vindicate his character and recover the damages to which he was lawfully entitled. His direct testimony to his purpose and his motives was, indeed, admissible. But his testimony relating to the course he pursued and detailing the acts he did when he learned of the publication was not less so, because men judge the purpose and the intentions of their fellows oftener and more wisely by their deeds than by their words.

The court erred in permitting the witness Mahin to testify to the effect that, before publishing the articles complained of, he received information in writing and print that over 1,000 papers had published the original libel, and would be called upon, by suits or otherwise, to respond therefor, in the face of the objection of the plaintiff that this testimony was secondary evidence, and in the face of his demand for the writings and the print from which this information was derived before it should be received.

The court erred in receiving in evidence in mitigation of damages, for the purpose of showing the intent with which the defendants made these publications, the papers in four suits, two of which were entitled Tyndale Palmer v. Roberts & Roberts and Tyndale Palmer v. The Constitution Democrat, and two of which were entitled Joao Francisco De Freitas against the same parties, in the absence of any proof that any of the defendants were aware of these papers or suits before they published the libels here in question. It is not competent to show the good intent or good faith of a libeler, in mitigation of damages, by proof of facts of which he had no knowledge when he made the publication. Edwards v. Kansas City Times Co. (C. C.) 32 Fed. 813; Hatfield v. Lasher, 81 N. Y. 246; Morey v. Morning Journal Association, 123 N. Y. 207, 25 N. E. 161, 9 L. R. A. 621, 20 Am. St. Rep. 730; Lothrop v. Adams, 133 Mass. 471, 43 Am. Rep. 528.

The court erred in permitting the defendant Mahin to testify, over the objection of the plaintiff, that he believed, from the facts and circumstances within his knowledge, that he was justified in writing the articles, and that he had in view the public good. It was undoubtedly competent and proper for the defendant to testify, if that was the truth, that he believed that the charges he published were true, and that he had no ill will against, or intent to injure, the plaintiff. But his belief, from the facts and circumstances within his knowledge, that he was justified in writing or publishing the libels, was incompetent and pernicious testimony, because it had no tendency to show whether he was influenced by a good or evil intent— a worthy or a wicked motive. He may have believed that he was justified in publishing the libels and in violating the rights of the plaintiff, because the latter had brought suit against him or against his company, the Journal Printing Company, and because he thought he was justified in returning evil for evil. The rule which permits a person whose purpose or intent is in issue to testify directly upon this subject is sufficiently liberal, and ought not to be farther extended. If the defendants believed that the accusations they made were true, and published them without ill will or intent to injure the plaintiff, these facts would certainly go as far with any jury toward mitigating the damages as the testimony of the defendant that he believed he was justified in publishing them. And if they did not believe that the charges were true, if they published them with ill will and with an intent to injure their victim, the fact that they believed they were justified in perpetrating such a wrong upon him ought not to relieve them, in whole or in part, from the damages which a jury might allow for so flagrant a violation of the law.

The plaintiff has assigned many other errors in the trial of this case, but a sufficient number has already been considered to demonstrate the necessity of another trial, and to draw the general lines within which it should be conducted. Further discussion is accordingly pretermitted, and the judgments below are reversed, with directions to grant new trials in both of the actions.