WILLIAM R. BROGAN, PLAINTIFF-APPELLANT, v. THE PASSAIC DAILY NEWS, A CORPORATION OF NEW JERSEY, AND ALLEN W. SMITH, IMPLD., ETC., DEFENDANTS-RESPONDENTS.

Argued May 21, 1956—Decided June 25, 1956.

144

*Mr. Harry Green* argued the cause for the appellant.

*Mr. John C. Barbour* argued the cause for the defendants.

*Mr. Morgan R. Seiffert* of counsel with *amicus curiae,* New Jersey Press Association.

The opinion of the court was delivered by

OLIPHANT, J. This is an appeal from a judgment of the Superior Court, Law Division, in a libel action entered on a jury verdict in favor of the plaintiff and against the

defendants for $1,000 in compensatory damages for libelous statements published by the defendants, and of no cause of action in favor of the defendants and against the plaintiff for punitive damages. We certified the case here on our own motion.

The defendant Passaic Daily News owns and publishes *The Passaic-Herald News*.

The libel action was based upon a publication made in the *Passaic-Herald News* of April 17, 1954. The defendants are the publisher of the paper and its managing editor Allen W. Smith, who wrote the article. At the time of the publication the plaintiff Brogan was a married man with a family, a member of the bar of this State and engaged in the practice of law in Clifton, a member of the Clifton City Council, and at the time of the publication he was a candidate for re-election, which election was held in May 1954. The gist of the newspaper article was that Brogan, accompanied by William Smith, was involved in a fist fight with the Dog Warden of the City of Clifton, one Stefano, on Good Friday afternoon, April 16, 1954, and that the embroglio or brawl occurred in a Clifton restaurant and bar and was the result of a political argument; that Brogan swung at Stefano, knocked him down, blackened his eye and engaged in a slug-fest until separated by onlookers; and that Brogan at 7:00 P.M. that evening went to Stefano and invited the dog warden to a tavern for a drink and that Stefano was reported to have refused or even to shake hands, forget it and keep quiet.

It was conceded at the trial that the article was palpably untrue and false, and the trial court correctly ruled it was defamatory *per se*. *Rogers v. Courier Post Co.*, 2 *N. J.* 393, 399 (1949), and the cases cited there. While Smith denied that at the time of the publication he knew this to be a fact, nevertheless the testimony shows that both Brogan and Stefano had denied the truth of the story to members of his staff who had reported the denials to him before the paper went to press. That same afternoon Stefano made a statement to his superiors at the Clifton

City Hall giving some details of the alleged brawl. Then again, in answer to a telephone call from the paper Brogan vehemently denied the alleged occurrence.

On the following Monday morning, April 19, at 8:00 A.M., Brogan, accompanied by William Smith, a friend who is named in the libelous article, and his attorney John F. Quinn, called on the managing editor Allen W. Smith, and presented 12 affidavits, all of which indicated that Brogan was not at the place where Stefano allegedly said the fight took place. These affidavits showed that at the time in question Brogan was attending Good Friday services in his church and spent the rest of the afternoon in his office. After some discussion, Quinn served on Smith a signed demand for a retraction on behalf of Brogan.

In their answer to the complaint which set forth the article in question the defendants admitted the publication but denied the matter complained of was false, malicious and defamatory, and denied that they had refused to make a retraction and set up the following separate defenses: (1) the article was not a libel; (2) it was published in good faith believing it to be true; (3) that in the next succeeding issue of the paper on April 19, 1954 they had retracted the article complained of in as public a manner as that in which it was published; (4) that the plaintiff was a candidate for public office at the time and that the statements contained in the article were within the boundaries of fair comment and were not motivated by actual malice.

The first point of plaintiff-appellant is that the court below erred by refusing to rule, as a matter of law, that the defendants had not retracted the libelous publication and by submitting the issue of retraction to the jury, despite the fact that the alleged retraction was clearly not full and complete, thereby prejudicing the plaintiff's claim to punitive damages.

Our statute, *N. J. S.* 2A:43–2, applicable to punitive damages in a libel suit provides as follows:

"The defendant, in an action for libel against the owner, manager, editor, publisher or reporter of any newspaper, magazine, periodical,

serial or other publication in this state, may give proof of intention; and plaintiff, unless he shall prove either malice in fact or that defendant, after having been requested by plaintiff in writing to retract the libelous charge in as public a manner as that in which it was made, failed to do so within a reasonable time, shall recover only his actual damage proved and specially alleged in the complaint."

There have been no cases in New Jersey as to the nature and sufficiency of a retraction under the statute, and the cases are in conflict elsewhere on the question whether the issue of sufficiency of a purported retraction of a libel is for the court or the jury. 13 *A. L. R.* 794; 13 *A. L. R. 2d* 287; 33 *Am. Jur.* 285, § 300.

The retraction in this case published on April 19, 1954 carried the heading "'UNMITIGATED LIE!' BROGAN SAYS OF STEFANO STORY." In the body of the story there was a two-sided version of the alleged fight, setting forth Brogan's denial and the contents of some of his affidavits, and Stefano's statement that the fight had occurred. It further stated that the *Herald-News* story was based on the Stefano statement, which was not a fact since the paper was on the street before the Stefano statement was completed, and it then went on to state

"The Herald-News regrets any embarrassment caused Councilman Brogan, who is a candidate for reelection, and will continue to probe the story until all of the facts are brought out."

A retraction is defined as "the act of withdrawing a declaration, *accusation,* promise, etc." *Webster's New International Dictionary* (*2d ed.*). It has been held that a retraction, as such, can be effected only if it is a full and unequivocal one which does not contain lurking insinuations or hesitant withdrawals. It must, in short, be an honest endeavor to repair all the wrong done by the defamatory imputation. *Prosser on Torts* (*2d ed.*), *p.* 633. Such an apology must be frank and full, since a guarded and half-hearted apology will only injure the defendant's position, and a so-called apology is not an apology at all unless it unreservedly withdraws all imputations and expresses regret for having made any. *Howell, Slander and Libel,* (*4th ed.*),

*p.* 880; 33 *Am. Jur.* 122, *sec.* 123; 13 *A. L. R.* 796; 13 *A. L. R. 2d* 288.

A mere publication of the injured party's denials of the original story does not constitute a retraction. *Palmer v. Mahin,* 120 *F.* 737, 746 (8 *Cir.* 1903). The mere publication of a news story relative to a proceeding in which the charges made in the article were at issue and the results thereof likewise does not amount to a retraction. *Sanford v. Boston Herald-Traveler Corp.,* 318 *Mass.* 156, 61 *N. E. 2d* 5 (*Sup. Jud. Ct.* 1945). For it is the duty of a newspaper to report such facts and this duty is the correlative responsibility of its right to freely report facts as news. This rule applies to an article published on May 5, 1954, on which date the *Passaic-Herald News* printed a subsequent article reporting that a special committee of the Clifton City Council had found there had been no altercation between Brogan and Stefano and had given the plaintiff a clean bill of health and recommending that action be taken against Stefano.

While a newspaper ought not to be put in the position of having, at a given moment, to weigh the information on which a story is founded, yet at such time when it becomes apparent that the information was false and a hoax, a newspaper, to escape punitive damages and take advantage of the shield of the statute, *N. J. S.* 2A:43–2, must at a reasonable time thereafter give equal space and notoriety to an unequivocal retraction, including an expression of regret that the plaintiff had been subjected to an unwarranted libel in the questioned article.

In the light of these principles we have carefully considered the news article of April 19, 1954, together with the subsequent article relied on by the defendants as a defense to punitive damages under the statute, and we have concluded that it is clear that reasonable men could not disagree that this was a retraction insufficient in law under the statute. The article was of a doubting and querulous nature containing not the slightest indication of regret that the plaintiff had been subjected to an unwarranted libel.

When it is clear that reasonable men cannot disagree as to a conclusion the question is one of law for the court and not for the jury. *Potoker v. Klein,* 105 *N. J. L.* 183, at 187 (*E. & A.* 1928); *Long v. Board of Chosen Freeholders, etc.,* 10 *N. J.* 380, 386 (1952); *Goolsby v. Forum Printing Co.,* 23 *N. D.* 30, 135 *N. W.* 661 (*Sup. Ct.* 1912); *Monaghan v. Globe Newspaper Co.,* 190 *Mass.* 394, 77 *N. E.* 476 (*Sup. Jud. Ct.* 1906); *Hotchkiss v. Oliphant,* 2 *Hill, N. Y.,* 510 (1842).

Contrariwise, if reasonable men cannot disagree that a retraction unreservedly withdraws the alleged defamatory remarks and imputations and expresses regret for having made such, the question of the sufficiency of the retraction would likewise be a question of law for the court and not for the jury.

■ Under the statute, if the retraction is sufficient in law two further conditions must be met if a demand for a retraction is served: (1) the retraction must be in as public a manner as that in which the charges were made, and (2) it must be made within a reasonable time. The issues with respect to these latter two propositions are mixed questions of law and fact, *Behrendt v. Times Mirror Co.,* 30 *Cal. App. 2d* 77, 85 *P. 2d* 949 (*D. Ct. App.* 1938); 13 *A. L. R. 2d* 287, and if reasonable men can disagree in their conclusions with respect thereto the question should be submitted to the jury in mitigation of damages. *Hager v. Weber,* 7 *N. J.* 201 (1951). But no such questions arise in this case since the attempted retraction was made in a reasonable length of time and given equal notoriety.

■ The trial court erred in submitting the issue as to whether or not there had been a retraction sufficient in law to the jury, but this error was mitigated somewhat when he correctly charged the jury "If there was not a retraction in accordance with the terms of the statute, then the punitive damages may be considered if all the other elements are present."

The second point of the appellant is that the trial court erred in ruling that *N. J. S.* 2A:81–10 applied to protect

the newspapers source of information on false and libelous publication, where malice was alleged thereby prejudicing plaintiff's claim to punitive damages.

The statute in question provides as follows:

"No person engaged on, connected with or employed on any newspaper shall be compelled to disclose, in any legal proceeding or trial, before any court, before any grand jury of any county or any petit jury of any court, before the presiding officer of any tribunal or his agent, or before any committee of the legislature, or elsewhere, the source of any information procured or obtained by him and published in the newspaper on which he is engaged, connected with or employed.

As used in this section the word 'court' means and includes the supreme court, the superior court, the county courts, the juvenile and domestic relations courts, the county district courts, the criminal judicial district courts, the surrogate's courts, any municipal court, any inferior court of limited criminal jurisdiction and any tribunal, commission or inquest operating under any order of any of the above enumerated courts."

■■■ The statute has been on the books since 1933 and has been before our courts only in the case of *State v. Donovan*, 129 *N. J. L.* 478 *(Sup. Ct.* 1943). In that case Mr. Justice Case held that the statute being in derogation of common-law rights should be strictly construed and that the courts are not to infer that the Legislature intended to alter the common-law principles further than is clearly expressed or than the case absolutely required. He then said, at *page* 487:

"A phase of the statute which suggests limited application is that the privilege is not made absolute in the sense that the statute forbids a newspaper editor to make answer—such a privilege, for instance, as prohibits an attorney from divulging confidential communications entrusted to him by his client—but leaves the witness free to tell or not to tell as he may choose. Thus, it depends, not upon the issue, or upon the rules of evidence, or upon the judgment of the court or other impartial arbiter, but upon the uncontrolled determination of the witness whether he will help or hinder an inquiry; and that condition is fraught with such serious consequences upon third persons that it ought not be applied unless the facts are clearly within the purview of the statute."

The serious consequences to third persons are implicit in the question raised by the appellant here.

The defendants plead in the defense to the plaintiff's cause of action that the article was published in good faith with the belief that it was true and also that the article was within the realm of fair comment, considering the fact that the plaintiff was a candidate for political office.

When the defendant Allen Smith was examined on despositions and asked to state whom he called to check and verify the story, he stated that he was going to rely on the protection of the statute and refused to disclose the source of his information. At the trial he was asked the following question by his own counsel, which was objected to:

"Q. You did. What did you base that article on? A. I based the article on information given to me over · the telephone by a *reliable source* plus verification of that *later* course." (Italics supplied.)

He then further testified over objection, as follows:

"Q. Now, what was the information that you received? A. My informant asked me if I had known about the clash between Bill Brogan and Tom Stefano in a spaghetti house on Main Avenue in Clifton. I said I didn't.

He said: Well, here is the background as they give you in newspaper offices. He related the entire story as I wrote and said that I think you will also find that Stefano is in the process or has completed dictating an affidavit in City Hall."

The appellant argues when the defendants pleaded fair comment and good faith as affirmative defenses and further testified that the libelous article was based upon "a reliable source" and disclosed information received from that source they waived any privilege that they may have claimed by *N. J. S.* 2A:81–10. We are in accord with this position of the appellant for the following reasons.

The statute is permissive and not mandatory and leaves a newspaper editor free to tell or not to tell the source of his information. One thing is clear: the statute confers a privilege upon the newspaper editor, and not upon the source, to protect his source of information if he chooses to do so. The statute says only that he may not be compelled

to reveal the source, but obviously he can voluntarily make a disclosure.

The position of the respondents in this case is that they insist on asserting these defenses based upon the reliability of the source of information upon which they relied, yet refuse to disclose what those sources were, so that the jury could ascertain whether they were in fact reliable.

■ A newspaper ought not to be able to give and take what it chooses when its own acts bring into question a liability on its part to others. If permitted to do as the defendant has here, the newspaper could give whatever information was favorable to its position and then plead the privilege to prevent any disclosure of the detrimental facts.

■ In a suit for defamation or libel the effect of this would be to deny the plaintiff punitive damages. This could only be justified on the ground that we find in the statute that the Legislature had in mind a public policy overruling the individual rights to punitive damages, and this we find to be doubtful to say the very least. While the statute is bottomed on public policy we are not prepared to say that the policy was designed to go so far as to abolish punitive damages or so alter the right as to bar recovery in individual actions.

If a newspaper may libel, and then defend, stating that the information came from a "reliable source," and then bar further inquiry into the source by pleading the statutory privilege, recovery would be denied in most cases if not all. Further where, as here, the defendant has voluntarily disclosed some of his sources as part of his direct case, it seems to us he could not thereafter choose not to reveal other sources. We agree with the thought expressed by a learned judge that this would amount to using the statute as a sword rather than as a shield as was intended when the statute was enacted.

■ The privilege given, like any other personal privileges, constitutional or statutory, can be waived and is waived by voluntary testimony of the person upon whom the privilege is conferred. *State v. Auld,* 2 *N. J.* 426, 437 (1949);

8 *Wigmore on Evidence* (*3d ed.*) *sec.* 2327 *et seq.;* 3 *Jones on Evidence, Civil Cases, sec.* 761 *et seq.;* 58 *Am. Jur.* 218, *sec.* 371; *Steen v. First National Bank, etc.,* 298 *F.* 36 (8 *Cir.* 1924); *Everett v. Everett,* 319 *Mich.* 475, 29 *N. W. 2d* 919 (*Sup. Ct.* 1947); *Pihl v. Morris,* 319 *Mass.* 577, 66 *N. E. 2d* 804 (*Sup. Jud. Ct.* 1946).

By way of analogy we point out that when the United States asserts its governmental immunity against disclosure of certain information when the United States is a party to civil litigation, the courts have held that although the United States will not be compelled to disclose privileged information, claims or counterclaims based thereon will be stricken. *O'Neill v. United States,* 79 *F. Supp.* 827 (*D. C. E. D. Pa.* 1948); *Bank Line, Ltd., v. United States,* 76 *F. Supp.* 801 (*D. C. S. D. N. Y.* 1948). See 4 *Moore's Federal Practice,* § 26.25 *et seq.* See *Annotations* on *"Governmental Privilege against Disclosure of Official Information,"* 97 *L. Ed. p.* 735 *et seq.*

Again by way of analogy, our statute, *N. J. S.* 2A :81–2, dealing with transactions with a lunatic or decedent, prohibits testimony by another party as to any transaction had with the decedent or lunatic unless the guardian of the lunatic or the representative first offers himself as a witness on his own behalf and testified to any transaction with or statement by his testator, intestate or ward. The design of that section of the Evidence Act was to produce equality between the parties.

 When the trial court upheld the claim of privilege by the witness Smith with respect to questions as to the identity of the "reliable source" of his information, he foreclosed the plaintiff of obtaining information favorable to its position to combat the defenses of good faith and fair comment and lack of malice raised by the defendants. The cross-examination of a party witness on matters directly in issue and directly relevant to the issue is a matter of right. *Babirecki v. Virgil,* 97 *N. J. Eq.* 315, 321 (*E. & A.* 1925); *Fidelity Union Trust Co. v. Sayre,* 137 *N. J. Eq.* 179, 181 (*E. & A.* 1945).

■ A construction of the statute permitting the deprivation of a party's right of cross-examination on vital issues of his cause of action could create constitutional difficulty or infirmity. It is our duty to so construe a statute that its enforcement is confined within constitutional limits. *Daly v. Daly*, 21 *N. J.* 599 (1956).

■ The witness Smith waived his statutory privilege by testifying that he received his information from "a reliable source" and then testifying as to the information he had received. Such testimony was relevant to the basic issues of fact and law raised by the complaint and the defenses of fair comment, good faith, truth, and lack of malice. At that point his testimony was compellable on cross-examination by the plaintiff as a matter of right, to enable the plaintiff to combat and meet the defendant's affirmative defenses. The trial judge erred in foreclosing the plaintiff's cross-examination as he did.

■ There remains the question whether the waiver of the privilege at the trial below is confined to that trial or will extend to the new trial which is ordered herein. There is authority that all privileges of exemption from giving testimony are exceptional and that a waiver of a privilege not to testify is not confined to the trial in which the waiver occurs but extends to a subsequent trial of the same case. The cases are collected in an annotation at 79 *A. L. R.* 173, 176; and see Professor Wigmore's discussion, at 8 *Wigmore, Evidence* (3rd ed. 1940), *p.* 67, 58 *Am. Jur., Witnesses, p.* 219. We have applied the principle in connection with the privilege against self-incrimination, *State v. Fary,* 19 *N. J.* 431, 440 (1955); *State v. Toscano,* 13 *N. J.* 418 (1953). We think, however, that the novelty of the question of waiver under *N. J. S.* 2A:81–10, as to which there is no decisive precedent here or elsewhere, justifies a relaxation of the ordinary principle for the purposes of the new trial. The defendant Smith may therefore elect to rely on his privilege at such new trial subject to rulings with respect thereto expressed herein or to testify fully and in detail

as to the identity of the "reliable source" and the information received from him and others.

The appellant questions the constitutionality of *N. J. S.* 2*A*:81–10 but we do not pass on this point in view of the fact that whatever immunity was conferred on the defendants by the statute was waived and the question was not raised below. *State ex rel. Wm. Eckelmann, Inc., v. Jones*, 4 *N. J.* 374, 375 (1950),.

We find no merit in the plaintiff's contention relating to the inadequacy of the verdict awarding him $1,000 in compensatory damages and that part of the judgment shall stand. The erroneous rulings of the trial court were harmful only with respect to the right of the plaintiff to punitive damages. Therefore the judgment of no cause of action in favor of the defendants and against the plaintiff as to punitive damages is reversed.

A new trial is awarded to the plaintiff on the question of liability of the defendants to the plaintiff for punitive damages, and the amount thereof, if any, as determined by the jury. The cause is remanded to be proceeded with in accordance with the reasons expressed in this opinion.

HEHER, J. (concurring in reversal). Related as it is to the issue of malice and punitive damages, *N. J. S.* 2*A*:43–2, I hold the view that the sufficiency of the "retraction" was peculiarly the province of the jury in the particular circumstances. See, *e. g., Turner v. Hearst*, 115 *Cal.* 394, 47 *P.* 129 (*Sup. Ct.* 1896). In *Risk Allah Bey v. Johnstone* (1868) 18 *L. T. N. S.* 620, Cockburn, Ch. J. said, charging a jury, that it was for them to consider whether the retraction was "fairly sufficient." See also *Osborne v. Troup*, 60 *Conn.* 485, 23 *A.* 157 (*Sup. Ct. Err.* 1891).

But I concur in the holding that the privilege granted by *N. J. S.* 2*A*:81–10 was waived by the defense of fair comment and good faith, followed by testimony of the defendant editor and writer of the allegedly libelous article that the content of the writing came from "a reliable source." The

defendants could not, by way of defense, justify the publication as emanating from a "reliable source," and then refuse to identify the source and thus preclude the qualitative assessment pertinent to the sufficiency of the defense in this regard. The defendant cannot invoke the statutory privilege to render conclusive their own evaluation of the character and quality of the source. This is basic to due process. Otherwise, cross-examination relevant to a crucial issue would be denied. The statute has no such sweep. It was not designed to reach this situation.

HEHER, J., concurring in result.

*For reversal and remandment*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, JACOBS and BRENNAN—5.

*For affirmance*—Justice WACHENFELD—1.