CENTRAL NEW JERSEY JEWISH HOME FOR THE AGED, PLAINTIFF, v. THE NEW YORK TIMES CO. ET AL., DEFENDANTS.

Superior Court of New Jersey
Law Division Middlesex County

Decided December 3, 1981.

*Frederick J. Dennehy* for plaintiff (*Wilentz, Goldman & Spitzer*, attorneys).

*Frederick L. Whitmer* (*Pitney, Hardin & Kipp*, attorneys), *Morton Stavis, Chester A. Just* for defendants.

QUACKENBOSS, J. S. C.

This controversy arose in the course of pretrial discovery. It may have interest beyond the perimeters of this lawsuit because it involves the confrontation between press freedom and the right of a defamation plaintiff to elicit information critical in

most such cases. The collision of these valued interests is occurring with increasing frequency in libel actions.

The case was instituted by Central New Jersey Jewish Home for the Aged and its Director, Elliot Solomon. They allege they were defamed in an article which appeared in the *New York Times* on December 16, 1979 and which had been written by Gertrude Dubrovsky, both defendants. The alleged libel involved charges of inadequate care of patients, labor strife at the Home and other improprieties practiced by the Home and Solomon. Plaintiffs charge malice and seek both compensatory and punitive damages. These defendants raise fair comment and opinion and absence of malice in their answer.

This motion resulted when hostilities broke out during the deposition of Gertrude Dubrovsky. She was asked to produce preliminary drafts of her article and, through her attorney, has refused. She was also confronted with the report of a state agency whose investigation seemed to exonerate plaintiffs with respect to at least some of the charges against them mentioned in the article. Ms. Dubrovsky apparently had knowledge of the report. She admitted that she did not consider referring to it in her article. However, when asked why she did not, her attorney directed her not to answer. Defendants' position is that these inquiries intrude into their state of mind and editorial processes, and plaintiffs have no right to such intrusions.

This motion is phrased in broad, general terms ("for an Order compelling defendants to answer all inquiries relevant to state of mind and the editorial process"), but the above two disputes are the only ones presented and my ruling is specifically limited to the propriety of those two areas of inquiry.

Defendants seem to agree that the First Amendment to the Federal Constitution does not afford them protection against the inquiries plaintiffs propose. *Herbert v. Lando*, 441 *U.S.* 153, 99 *S.Ct.* 1635, 60 *L.Ed.*2d 115 (1979), is dispositive. However, they contend that New Jersey's "Shield Law" (*N.J.S.A.* 2A:84A–21) and Article 1, ¶ 6, of the State Constitution prohibit plain-

tiffs from inquiring into their editorial processes and the bases for their editorial decisions. Let us first consider the applicability of the "Shield Law":

Subject to Rule 37, a person engaged on, engaged in, connected with, or employed by news media for the purpose of gathering, procuring, transmitting, compiling, editing or disseminating news for the general public or on whose behalf news is so gathered, procured, transmitted, compiled, edited or disseminated has a privilege to refuse to disclose, in any legal or quasi-legal proceeding or before any investigative body, including, but not limited to, any court, grand jury, petit jury, administrative agency, the Legislature or legislative committee, · or elsewhere.

a. The source, author, means, agency or person from or through whom any information was procured, obtained, supplied, furnished, gathered, transmitted, compiled, edited, disseminated or delivered: and

b. Any news or information obtained in the course of pursuing his professional activities whether or not it is disseminated. [*N.J.S.A.* 2A:84A–21]

Defendants make a close-range examination of this language. From paragraph (a) they extract the words "means" and "edited" and conclude that an author's and editor's mental processes in evaluating and selecting material are protected from compulsory disclosure; thus, protection for the editorial process. They reason further from "information .... whether or not it is disseminated," in paragraph (b), that the preliminary drafts of the article are protected as well. After all, what are such drafts if not undisseminated information?

However, such an approach does not always yield a clear view of the meaning and intent of a statute. Indeed, in this case it could be said to produce a result in conflict with defendants' position. Paragraph (a) protects "The source, author, means, agency or person from or through *whom* any information was procured ...." (Emphasis supplied). The use of the personal pronoun "whom" suggests that the entire paragraph protects only the disclosure of the identity of persons, not thought processes. And as for including a journalist's preliminary drafts within the meaning of "information obtained," it gives that phrase virtually no bounds at all.

As with studying a fine painting, a better appreciation and understanding of its meaning is usually gained by stepping

back and making one's inspection from a respectable distance. Doing so causes me to conclude that the "Shield Law" was not intended to protect the editorial process as revealed by material selection decisions and preliminary drafts of a newspaper article.

Historically, the reporter's concern has been the protection of confidential sources and confidential information gained. Most certainly, our Legislature enacted *N.J.S.A.* 2A:84A–21 in its original form to protect such sources and information recognizing how necessary such protection was in order to insure an untrammeled flow of information to the public. There is no evidence that satisfied me that the statute in its present form is intended to protect more.

I reject the argument that the word "means" was inserted in the statute to broaden its coverage to include the editorial process. As observed by Judge Knight in *Beecroft v. Point Pleasant Print. & Pub. Co.*, 82 *N.J.Super.* 269 (Law Div.1964), this was undoubtedly part of a revision designed to evade the ruling of *State v. Donovan*, 129 *N.J.L.* 478 (Sup.Ct.1943), wherein the identity of a messenger who delivered an article to the newspaper had to be revealed.

Defendants also argue that recent cases, such as *In re Farber*, 78 *N.J.* 259 (1978), *cert.* den., 439 *U.S.* 997, 99 *S.Ct.* 598, 58 *L.Ed.* 2d 670 (1978), and *State v. Boiardo*, 82 *N.J.* 446 (1980), evidence a policy favoring a broad interpretation of the "Shield Law." But neither case involved the claimed protection for the editorial process. What is more, the very language of *Farber* seems to support the view that while courts should construe the statute liberally in order to effectuate the protection intended, the *subject* of that protection is limited to confidential sources and information:

> We read the legislative intent in adopting this statute in its present form as seeking to protect the confidential sources of the press as well as information so obtained by reporters and other news media representatives to the greatest extent permitted by the Constitution of the United States and that of the State of New Jersey. [78 *N.J.* at 270.]

There is no indication in this language that the "Shield Law" prevents inquiry into the thinking processes of the writer in selecting and rejecting material or as revealed by the various preliminary drafts of the article. I do not believe it does.

What is more, if I concluded that such protection did exist, I would also be forced to conclude that defendants had waived that protection by raising the defenses they do and putting in issue the good faith of their editorial process.

Waiver of a newspaperman's privilege under the "Shield Law" has been considered before by our courts. *Brogan v. Passaic Daily News,* 22 *N.J.* 139 (1956), involved the refusal to reveal the source of defendant's story. The Supreme Court felt that the privilege to refuse that information had been waived when the reporter testified in his defense that the defamatory material had been given by a "reliable source." The court's rationale was explained most clearly in Justice Heher's concurring opinion:

> The defendants could not, by way of defense, justify the publication as emanating from a "reliable source", and then refuse to identify the source and thus preclude the qualitative assessment pertinent to the sufficiency of the defense in this regard. The defendant cannot invoke the statutory privilege to render conclusive their own evaluation of the character and quality of the source. This is basic to due process. Otherwise, cross-examination relevant to a crucial issue would be denied." [at 155–156.]

Following that reasoning, *Beecroft v. Point Pleasant Print. & Pub. Co.,* 82 *N.J.Super.* 269 (Law Div.1964), held that the privilege not to disclose during discovery confidential sources and information was waived by raising such defenses as fair comment, good faith and lack of malice. More recently, the very same conclusion was reached with respect to waiver of the "Shield Law" privilege in *Resorts International, Inc. v. N.J.M. Associates,* 180 *N.J.Super.* 459 (Law Div.1981).

While *Brogan* might be distinguished from the situation here and while *Beecroft* and *Resorts* may not be binding on this court as a technical matter, these cases represent a view of our "Shield Law" and the waiver of the privileges it confers which

has existed for 25 years. It should not be casually discarded by a trial court. I would, however, not hesitate to distinguish *Brogan* and to declare my independence of the decisions of my colleagues in the Law Division if I felt there was legal justication therefor. I do not believe there is. I believe these cases accurately reflect the law respecting waiver of "Shield Law" privileges.

Our Legislature has seen fit to amend the "Shield Law" several times since its original passage. It was amended after *Brogan* and, again, after *Beecroft.* If our courts were utilizing the concept of waiver to restrict the protection of the "Law" contrary to the intention of the Legislature, one would think the amendments would have included language clearly demonstrating that fact. They do not. One can well reason, then, that the Legislature does not disagree with the limitations placed on the "Shield Law" by *Brogan* and *Beecroft.*

In frustration, defendants argue that the *Brogan, Beecroft* and *Resorts* view of waiver is a limitation that effectively destroys the privilege, that the privilege completely loses its efficacy in libel actions where issues of malice and good faith in the editorial process are almost always involved. This is not so much an argument against the rule as it is simply a recognition of the fact that the privilege is inappropriate in most libel actions—and *should be*, according to the *Brogan, Beecroft* and *Resorts* courts.

I turn now to a consideration of the debate over whether Art. I, ¶ 6 of the New Jersey Constitution denies plaintiffs the right to inquire into the editorial process in the interest of free press.

As mentioned earlier, defendants concede that the United States Constitution does not prevent inquiry into the editorial judgment used to construct the article in question. *Herbert v. Lando, supra.* They argue, however, that our State Constitution offers broader protection and does preclude the intrusion into defendants' mental processes which plaintiffs seek here. Art. I, ¶ 6, provides:

No law shall be passed to restrain or abridge the liberty of speech or of the press.

Emphasis is placed on the inclusion of "restrain" which distinguishes our Constitution from the First Amendment to the U. S. Constitution. Defendants argue—and quite cogently—that this addition to our Constitution was intended to grant *additional* protection to speech and to the press. But does that additional protection extend as far as defendants urge? Does it extend so far as to deny a defamation plaintiff the right to see preliminary drafts of the article in question and to ask why certain material was included while other pertinent information was omitted? No decided case resolves this question.

Classic form in deciding such issues requires recognizing the competing interests involved in the controversy and weighing them. For that reason defendants argue eloquently of the value of vigorous, robust language and of uninhibited, wide-open debate. They say these attributes of a truly free press will be stifled by the right of a civil litigant to question the choice of material and language. The result will be to require news articles to be written virtually in sterile form.

Plaintiffs contend—with equal effectiveness—that defendants overreact and that there is no real threat presented to a free press. The threat, if any, is to an irresponsible press. They point out the need of a plaintiff, defamed in an article, to learn about the authorial and editorial thinking that produced the article in order to show improper motivation.

These and other policy considerations to be found in this conflict were discussed at length by Justice White in his opinion in *Herbert v. Lando, supra.* No purpose would be served by my reciting that lengthy discourse herein. However, speaking for the majority of the court, he balanced those considerations in favor of the inquiring alleged defamee. I concur in this policy judgment made by the Supreme Court.

To be sure, Justice White's thinking was in the context of federal First Amendment rights, but the policy considerations are identical regardless of which constitution is in issue.

Unquestionably, granting civil litigants license to inquire into the mental processes of journalists will do *some* disservice to a responsible free press. However, the disservice done will be minimal. But if this right to inquire is denied, a far more significant loss will be suffered by many truly wronged persons. In many cases of actionable libel, denying the right to such discovery will effectively deny plaintiff a remedy. And the primary beneficiary of such a rule will be the malicious or irresponsible defamer.

These considerations lead me to the conclusion that even the heightened protection afforded the press by the New Jersey Constitution does not prevent these plaintiffs from examining the preliminary drafts of the article and from having answers to the questions which Ms. Dubrovsky declined to answer at her deposition. Plaintiffs' motion is granted.