JOSEPH A. MARESSA, PLAINTIFF-RESPONDENT, v. NEW JERSEY MONTHLY AND HENDRIX F. C. NIEMANN AND CHRISTOPHER LEACH AND MICHAEL ARON AND TERESA CARPENTER AND HARVEY FISHER AND ROBERT NARUS, JOINTLY, SEVERALLY AND IN THE ALTERNATIVE, DEFENDANTS-APPELLANTS.

Argued January 11, 1982—Decided May 6, 1982.

*Alan M. Wallack* argued the cause for appellants (*Brener, Wallack & Hill,* attorneys; *Alan M. Wallack* and *Joseph C. Mahon,* on the brief).

*Arthur B. Hanson,* a member of the District of Columbia Bar, argued the cause for *amicus curiae* American Newspaper Publishers Association (*Jamieson, McCardell, Moore, Peskin & Spicer,* attorneys; *Arthur B. Hanson, Frank M. Northam, Mitchell W. Dale* and *Arthur D. McKey,* members of the District of Columbia Bar, of counsel; *Thomas C. Jamieson, Jr.* and *Frances Goldmark,* on the brief).

*Benjamin Goldstein* argued the cause for respondent (*Maressa, Goldstein, Birsner & Patterson*, attorneys; *Benjamin Goldstein* and *Nancy D. Gold*, on the brief).

*Thomas J. Cafferty* and *Frances Goldmark* submitted a brief on behalf of *amici curiae* New Jersey Press Association and the Trenton Times Corporation (*Seiffert, Frisch, McGimpsey & Cafferty* and *Jamieson, McCardell, Moore, Peskin & Spicer*, attorneys).

*Peter G. Banta* submitted a brief on behalf of *amicus curiae* The Bergen Evening Record Corporation (*Winne, Banta & Rizzi*, attorneys; *Peter G. Banta* and *Donald A. Klein*, of counsel).

The opinion of the Court was delivered by

PASHMAN, J.

Twice in recent years, this Court has mediated between a newsperson's right not to disclose confidential information and a criminal defendant's right to compel the production of witnesses in his or her favor. *State v. Boiardo*, 82 *N.J.* 446 (1980); *In re Farber*, 78 *N.J.* 259 (1978). We have held that the New Jersey Shield Law, *N.J.S.A.* 2A:84A–21, protects confidential information gathered by news media "to the greatest extent permitted by the Constitution of the United States and that of the State of New Jersey." *Farber*, 78 *N.J.* at 270. Because criminal defendants have a constitutional right to obtain evidence necessary to their defense, *U.S.Const.*, Amend. 6; *N.J.Const.* (1947), Art. I, par. 10, including confidential information, we held in those criminal cases that the newsperson's privilege is not absolute.

Today, for the first time since the landmark libel case of New *York Times v. Sullivan*, 376 *U.S.* 254, 84 *S.Ct.* 710, 11 *L.Ed.2d* 686 (1964), this Court must decide whether the Shield Law allows newspersons who are sued for libel to refuse to disclose their sources and editorial processes leading to publication of the alleged libel. As in the earlier criminal cases, we must decide

here whether a countervailing constitutional right limits the Shield Law.   In the present suit, which seeks monetary damages for alleged injury to reputation, we find no such right.   We therefore hold that the newsperson's privilege in a civil action for libel is absolute.   Since defendants have not waived their privilege, the trial court's order compelling answers to plaintiff's discovery requests must be reversed.

## I

The October 1979 issue of *New Jersey Monthly* magazine contains an article entitled "Rating the Legislature" that evaluates the performance of New Jersey legislators.   The article discusses several categories of representatives—including "The Best," "The Worst" and "The Drones."   Plaintiff, Senator Joseph Maressa, appeared under "The Worst" category.   He was described as a "floundering and ineffectual" man whose shortcomings went unnoticed by scores of extremists who, "appealing to Maressa's considerable ego, managed to enlist him as their advocate this term."   Describing Maressa as "callous, stupid, and just plain devious," the article's authors listed several incidents upon which they based the senator's low rating.   The article claimed that during a Senate debate of the death penalty, Maressa whined and attempted to cut off debate;   that he smuggled an anti-gay lobbyist onto the Senate floor and then lied to the sergeant-at-arms that the lobbyist was his aide;   that he was called before the Legislative Ethics Committee;   and that he was "shot down" by the Supreme Court Advisory Committee. The article concluded, "Maressa's problem is not so much that he is evil as that he is sneaky, self-interested, and basically unprincipled."

Maressa filed a libel action in the Superior Court, Law Division, on December 12, 1979 against the magazine's owner, publisher, editor-in-chief, an editor and the three reporters who wrote the article.   He alleged that the article falsely conveyed

to the public that he was unfit to serve the people of New Jersey, and that he had participated in dishonest, illegal and unethical practices. Maressa further alleged that defendants had published the defamatory falsehoods without making reasonable inquiries as to their accuracy, thereby defaming him in reckless disregard of the truth.[1]

This interlocutory appeal arose during pretrial discovery proceedings. On February 11, 1980 plaintiff served interrogatories upon defendants, and on April 8, 1980 plaintiff took the depositions of the three reporter defendants. Maressa sought a broad range of information including names and addresses of all sources interviewed, copies of all rough drafts, notes, questions and memos pertaining to the article, and a summary of what each source told the reporters. Defendants refused to provide any information about their sources or editorial processes. They answered each interrogatory with the word "privileged."

Plaintiff sought an order from the Law Division compelling more specific answers to the interrogatories and deposition questions. On June 27, 1980 the trial court ruled that the responses sought by plaintiff were not privileged; alternatively, the court found that any newsperson's privilege had been waived. Maressa then served upon defendants a supplemental set of interrogatories containing the unanswered questions. After defendants again claimed the newsperson's privilege, the trial court on October 15, 1980 directed them to provide more specific answers within 20 days or face judicial sanctions.

The Appellate Division granted defendants leave to appeal the order compelling disclosure. Before that court heard the appeal, we directly certified the matter on our own motion. *R.* 2:12–1. We now reverse.

---

[1]Maressa concedes that he is a public figure who must prove defendants' reckless or willful disregard of the truth in order to recover damages for libel. *New York Times v. Sullivan,* 376 *U.S.* 254, 84 *S.Ct.* 710, 11 *L.Ed.2d* 686 (1964).

## II

The newsperson's privilege in New Jersey dates from a 1933 statute,[2] *L.*1933, *c.* 167; *N.J.S.A.* 2:97–11. Like other evidentiary privileges, it limits the common law right to compel testimony in judicial proceedings. The Legislature enacts such privileges "because in the particular area concerned, they are regarded as serving a more important public interest than the need for full disclosure." *State v. Briley,* 53 *N.J.* 498, 506 (1969).

Unlike most other privileges, however, a newsperson's privilege has a constitutional foundation. While narrowly upholding a grand jury's right to subpoena reporters, the United States Supreme Court has unanimously recognized that a reporter's gathering of information receives some First Amendment protection. *See Branzburg v. Hayes,* 408 *U.S.* 665, 691, 92 *S.Ct.* 2646, 2661, 33 *L.Ed.*2d 626 (1972) (opinion of White, J., joined by Burger, C. J., and Blackmun, Rehnquist, JJ.); *id.* at 709, 92 *S.Ct.* at 2670 (Powell, J., concurring); *id.* at 712, 92 *S.Ct.* at 2686 (Douglas, J., dissenting); *id.* at 725, 92 *S.Ct.* at 2694 (Stewart, J., dissenting, joined by Brennan and Marshall, JJ.).

*Richmond Newspapers, Inc. v. Virginia,* 448 *U.S.* 555, 100 *S.Ct.* 2814, 65 *L.Ed.*2d 973 (1980), which recognized a First Amendment right to attend criminal trials, reinforced the newsperson's right to gather information:

whether we describe this right . . . as a 'right of access' . . . or a 'right to gather information,' . . . we have recognized that 'without some protection for seeking out the news, freedom of the press could be eviscerated.' [448 *U.S.* at 576, 100 *S.Ct.* at 2827 (quoting *Branzburg v. Hayes,* 408 *U.S.* at 681, 92 *S.Ct.* at 2656; additional citations and footnote omitted).]

Lower federal courts have read *Branzburg* as supporting some First Amendment protection for reporters' use of confidential sources. *See, e.g., Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 *F.*2d 583, 594–95 (1st Cir. 1980); *Gulliver's. Periodicals,*

---

[2] New Jersey courts had not recognized a privilege under common law. In *In re Julius Grunow,* 84 *N.J.L.* 235 (Sup.Ct.1913), the court affirmed a $25 contempt fine against a reporter who had refused to divulge his sources, holding that the asserted privilege "finds no countenance in the law."

*Ltd. v. Chas. Levy Circulating Co.,* 455 *F.Supp.* 1197, 1202 (N.D.Ill.1978); *see also* Lindberg, *Source Protection in Libel Suits,* 81 *Colum.L.Rev.* 338 (1981).

Federal constitutional protection of news gathering, however, gives newspersons only a qualified privilege not to reveal sources and other confidential information. In *Branzburg v. Hayes, supra,* the Court upheld grand jury subpoenas of newspaper reporters in three state courts. And in *Herbert v. Lando,* 441 *U.S.* 153, 99 *S.Ct.* 1635, 60 *L.Ed.*2d 115 (1979), the Court held that the First Amendment does not preclude a plaintiff's inquiries into the editorial processes leading to publication of an allegedly defamatory television program.

To buttress the constitutional protection for news gathering, the Legislature has amended the Shield Law, *N.J.S.A.* 2A:84A–21, twice in recent years. Both enactments were in large part responses to judicial construction limiting the effect of the statute.

The bill that ultimately led to the 1977 Shield Law amendments, *L.*1977, *c.* 253, was introduced shortly after the Appellate Division upheld incarceration of a newspaper reporter for his refusal to testify in *In re Bridge,* 120 *N.J.Super.* 460 (1972),[3] *cert. den.* 410 *U.S.* 991, 93 *S.Ct.* 1500, 36 *L.Ed.*2d 189 (1973). There the court found that by disclosing the name of his source and some information received from the source, the reporter had waived his statutory privilege under the waiver provisions of *Evid. R.* 37, *N.J.S.A.* 2A:84A–29.[4]

---

[3]The legislative history of *L.* 1977, *c.* 253 is discussed in *In re Vrazo Subpoena,* 176 *N.J.Super.* 455, 461–62 (Law Div.1980).

[4]Evidence Rule 37 states:

A person waives his right or privilege to refuse to disclose or to prevent another from disclosing a specified matter if he or any other person while the holder thereof has (a) contracted with anyone not to claim the right or privilege or, (b) without coercion and with knowledge of his right or privilege, made disclosure of any part of the privileged matter or consented to such a disclosure made by anyone.

At the time *Bridge* was decided, the statute granting the newsperson's privilege provided as follows:

> Subject to Rule 37, a person engaged on, connected with, or employed by, a newspaper has a privilege to refuse to disclose the source, author, means, agency or person from or through whom any information published in such newspaper was procured, obtained, supplied, furnished or delivered.
>
> L.1960, c. 52, p. 458, § 21, eff. July 1, 1960. [footnote omitted.]

The Legislature responded to the finding of waiver in *In re Bridge* by creating separate privileges such that disclosure of information provided by a confidential source did not require the newsperson to identify the source. Beyond addressing the waiver issue, however, the Legislature thoroughly revamped the newsperson's privilege to make it more comprehensive. The Legislature revised the privilege to read:

> Subject to Rule 37, a person engaged on, engaged in, connected with, or employed by news media for the purpose of gathering, procuring, transmitting, compiling, editing or disseminating news for the general public or on whose behalf news is so gathered, procured, transmitted, compiled, edited or disseminated has a privilege to refuse to disclose, in any legal or quasi-legal proceeding or before any investigative body, including, but not limited to, any court, grand jury, petit jury, administrative agency, the Legislature or legislative committee, or elsewhere.
>
> a. The source, author, means, agency or person from or through whom any information was procured, obtained, supplied, furnished, gathered, transmitted, compiled, edited, disseminated, or delivered; and
>
> b. Any news or information obtained in the course of pursuing his professional activities whether or not it is disseminated. . . .
>
> L.1977, c. 253, § 1, eff. Oct. 5, 1977; N.J.S.A. 2A:84A-21.

These amendments left no doubt that the Legislature intended to provide comprehensive protection for all aspects of news gathering and dissemination. The Court recognized this intent in *In re Farber*, holding:

> We read the legislative intent in adopting this statute in its present form as seeking to protect the confidential sources of the press as well as information so

---

> A disclosure which is itself privileged or otherwise protected by the common law, statutes or rules of court of this State, or by lawful contract, shall not constitute a waiver under this section. The failure of a witness to claim a right or privilege with respect to 1 question shall not operate as a waiver with respect to any other question.
>
> L.1960, c. 52, p. 459, § 29, eff. July 1, 1960.

obtained by reporters and other news media representatives *to the greatest extent permitted by the Constitution of the United States and that of the State of New Jersey.* [78 *N.J.* at 270 (emphasis added).]

Disclosure of confidential information was ordered in *Farber* only because the newsperson's privilege conflicted with a criminal defendant's constitutional right to compel the attendance of witnesses and production of evidence in his favor.[5]

Following our decision in *Farber*, the Legislature again amended the Shield Law to grant newspersons increased protection in accord with constitutional limits. The new amendments established stringent prerequisites for judicial enforcement of a subpoena issued on behalf of a criminal defendant.[6] Applying the newly amended Shield Law in *State v. Boiardo, supra*, the Court vacated an order in a murder trial compelling a reporter to produce for *in camera* inspection a letter written by a prospective government witness. We found that the defendant had not met the statutory requirement of demonstrating the lack of less intrusive sources of the information contained in the letter. Moreover, we reaffirmed our holding in *Farber* "that the privilege created by *N.J.S.A.* 2A:84A–21, was intended by the Legislature to be *as broad as possible.*" 82 *N.J.* at 457 (emphasis added).

Twice in recent sessions, the Legislature has made evident its intent to preserve a far-reaching newsperson's privilege in this State. And twice in recent terms, this Court has construed the Shield Law to protect confidential information to the extent allowed by the United States and New Jersey Constitutions. Absent any countervailing constitutional right, the newsperson's statutory privilege not to disclose confidential information is absolute.

---

[5] *U.S.Const.*, Amend. 6; *N.J.Const.* (1947), Art. I, par. 10.

[6] These amendments require the party seeking enforcement of the subpoena to prove either that the materials sought are necessary to the defense and not obtainable from any less intrusive source, or by clear and convincing evidence that the privilege has been waived. *N.J.S.A.* 2A:84A–21.3. The determination must be made before the trial judge orders *in camera* inspection. *Id.*

Plaintiff contends that this absolute privilege does not apply to certain news gathering activities that may be characterized as "editorial processes." These would include communications between newspersons, decisions about which leads to pursue and what information to publish, and the development of a newsperson's belief in the veracity of what he or she pursues and publishes. A reporter's basis for believing in the veracity of what is published has particular importance in an action for defamation by a public figure because, under *New York Times Co. v. Sullivan, supra,* a public figure must prove "actual malice" —wilful or reckless disregard of the truth—to recover damages. According to plaintiff, because the Shield Law's enumeration of protected activities does not precisely specify "editorial processes," they are beyond the protection of the statute.

Plaintiff's argument is simplistic. It would deny comprehensive effect to the Shield Law merely because the Legislature did not include those specific words in its exhaustive list of news-gathering activities. It is clear that the Legislature did not intend such a narrow interpretation. The Legislature plainly expressed its intent that all significant news-gathering activities be protected. The Shield Law protects against disclosure of the "*source, author, means, agency or person* from or through whom any information was *procured, obtained, supplied, furnished, gathered, transmitted, compiled, edited, disseminated, or delivered.*" *N.J.S.A.* 2A:84A–21(a) (emphasis added). It also separately protects "any news or information obtained in the course of pursuing ... professional activities whether or not it is disseminated." *N.J.S.A.* 2A:84A–21(b). This litany of protected activities was clearly intended to afford complete and pervasive security against disclosure.

Discovery of editorial processes is especially threatening to newspersons because it inhibits the exchange of ideas that is crucial to the functioning of a free and vigorous press. In his dissent in *Herbert v. Lando, supra,* Justice Brennan noted the concerns that had impelled the Court of Appeals, 568 *F.*2d 974,

(2nd Cir.) to find an absolute privilege not to disclose editorial processes as a matter of First Amendment right:

"[i]deas expressed in conversations, memoranda, handwritten notes and the like, if discoverable, would in the future 'likely' lead to a more muted, less vigorous and creative give-and-take in the editorial room." Chief Judge Kaufman stated that "[a] reporter or editor, aware that his thoughts might have to be justified in a court of law, would often be discouraged and dissuaded from the creative verbal testing, probing, and discussion of hypotheses and alternatives which are the sine qua non of responsible journalism." [441 *U.S.* at 193, 99 *S.Ct.* at 1657, 60 *L.Ed.*2d at 144, quoting *Herbert v. Lando*, 568 *F.*2d at 993–94 (Oakes, J., concurring); *id.* at 980 (Kaufman, C. J.)]

Although the United States Supreme Court reversed the Court of Appeals' decision, nothing in *Herbert v. Lando* militates against our interpreting the Shield Law to include the editorial process. The Court there simply held that the First Amendment does not grant a privilege to withhold editorial processes. There was no Shield Law at issue in the case. Moreover, the Court in *Branzburg v. Hayes*, 408 *U.S.* at 706, 92 *S.Ct.* at 2669, recognized that its holding does not "bar state courts from responding in their own way and construing their own Constitutions so as to recognize a newsman's privilege, *either qualified or absolute.*" (Emphasis added).

We need not determine whether the state constitution grants an absolute evidentiary privilege to newspersons not to disclose editorial processes, for it is clear that the state courts are equally free to enforce a privilege enacted by statute. As we stated in *Boiardo, supra,* "Absent . . . any clear impingement on Sixth Amendment [or other constitutional] rights, the Court's task is simply to determine the legislative intent and to construe the statute accordingly." 82 *N.J.* at 457. We therefore construe the Shield Law's comprehensive language as applying to the decision-making processes of newspersons.

To summarize, we hold that the New Jersey Shield Law affords newspersons an absolute privilege not to disclose confidential sources and editorial processes, absent any conflicting constitutional right. We must now consider whether assertion of the newsperson's privilege impinges upon any constitutional

rights of a plaintiff seeking money damages in a civil suit for defamation.

### III

The law of defamation imposes liability for the publication of false matters injuring the reputation of others. W. Prosser, *Law of Torts* § 111 at 739 (4th ed. 1971). Originally ignored by the common law courts and enforced instead by ecclesiastical tribunals, which regarded the publication as sin, *id.* at 737, defamation has become firmly embedded in all common law jurisdictions. Defamation "embodies the important public policy that individuals and business entities should generally be free to enjoy their reputations unimpaired by false and defamatory attacks." *Rainier's Dairies v. Raritan Valley Farms, Inc.*, 19 *N.J.* 552, 557 (1955). Decisions of this Court, *see, e.g., Rainier's Dairies, supra; Brogan v. The Passaic Daily News*, 22 *N.J.* 139 (1956), and the United States Supreme Court, *see, e.g., New York Times, supra; Herbert v. Lando, supra*, recognize the important societal interest in the protection of individual reputations.

However, the existence of a judicial remedy for injury to reputations is entirely a matter of state law. A plaintiff's "interest in reputation is simply one of a number which the State may protect against injury by virtue of its tort law, providing a forum for vindication of those interests by means of damages actions." *Paul v. Davis*, 424 *U.S.* 693, 712, 96 *S.Ct.* 1155, 1165, 47 *L.Ed.2d* 405, 420 (1976).[7]

Following *Paul v. Davis*, federal courts have noted that "the State has created the [defamation] cause of action and hence

---

[7] The holding in *Paul v. Davis* was that an allegation of injury to reputation by a public official acting in the course of his duty, without official approval, failed to state a claim under 42 *U.S.C.* 1983 or the Fourteenth Amendment. *Paul v. Davis* did not affect a prospective plaintiff's right to sue for defamation under state law. It merely held that the right is not constitutionally based.

... it can limit, modify or perhaps take it away through the operation of testimonial privileges, absent any claim of constitutional deprivation." *Mazzella v. Philadelphia Newspapers*, 479 *F.Supp.* 523, 528 (E.D.N.Y.1979). In *Steaks Unlimited, Inc. v. Deaner*, 623 *F.*2d 264 (1980), the Third Circuit interpreted the Pennsylvania Shield Law, 42 *Pa.Const.Stat.Ann.* § 5942(a) (Supp.1979), which is similar to the New Jersey Shield Law, as granting defendants the right not to disclose the unused portions of film taken for an allegedly defamatory television report. The court found that the privilege did not deny due process because there was no constitutional interest in defamation:

The Constitution has never been construed as requiring the states to provide persons or organizations who have been defamed with a remedy for their injuries. It follows that, to the extent a state chooses to authorize a cause of action for defamation, it may also limit the plaintiff's ability to prove his claim in order to promote other social purposes. [*Id.* at 279 n.74]

Likewise, this Court has held that although defamation actions serve an important public policy, "in certain situations there is a paramount public interest that persons be permitted to speak or write freely without being restrained by the possibility of an ensuing defamation action." *Rainier's Dairies*, 19 *N.J.* at 557–58. In many contexts our courts have refused to recognize a cause of action for defamatory statements, including statements made during judicial proceedings, *see Rogers v. Thompson*, 89 *N.J.L.* 639 (E. & A. 1916), before administrative agencies, *see Rainier's Dairies, supra*, and in complaints filed with this Court's Committee on Professional Ethics, *see Friedland v. Podhoretz*, 174 *N.J.Super.* 73 (Law Div. 1980). These limitations on the tort of defamation raise no constitutional issue because

the State's interest in fashioning its own rules of tort law is paramount to any discernible federal interest, except perhaps an interest in protecting the individual citizen from state action that is wholly arbitrary or irrational. [*Martinez v. California*, 444 *U.S.* 277, 282, 100 *S.Ct.* 553, 557, 62 *L.Ed.*2d 481, 487 (1980)]

The Shield Law protection of confidential news sources clearly does not constitute arbitrary or irrational state action.

■ We respectfully reject Justice Schreiber's argument that the New Jersey Constitution creates a constitutional right to maintain a libel action. Our dissenting colleague relies on Article 1, ¶ 6 of the Constitution:

> 6. *Liberty of speech and of the press; libel; province of jury.*
>
> Every person may freely speak, write and publish his sentiments on all subjects, *being responsible for the abuse of that right.* No law shall be passed to restrain or abridge the liberty of speech or of the press. In all prosecutions or indictments for libel, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact. [Emphasis added]

Justice Schreiber would find a constitutional right to sue for libel in the underscored subordinate clause.

We disagree that the framers intended that clause to have such wide-ranging effect. The entire thrust of Art. 1, ¶ 6 is protection of speech. The framers, however, did not want that protection to be absolute. Specifically, they did not view the existence of a libel action as inimical to free speech. They therefore inserted a clause to insure that the broad speech protection they were providing would not be construed to preclude libel suits.

This is all that the clause means. We do not believe it was intended to create a right to sue for damages in libel. Had the framers intended such a right, they surely would have expressed that intent more directly. In form and in context, this clause is no more than a caveat to the New Jersey equivalent to the First Amendment.

It would not be wise to construe our Constitution in a way that etches in stone any particular resolution of the difficult conflict between the right of the media to criticize public figures and the right of public figures to have redress for libel. Our holding, premised on our perception of legislative intent, balances those interests differently than the dissent would balance them. But the balance we adopt can always be changed by the Legislature. If we were to adopt the dissent's view, full protec-

tion for sources or editorial processes could only be provided by constitutional amendment.

We also reject plaintiff's argument that denying him discovery of material potentially crucial to his claim is a violation of due process. He cites *dictum* in *Brogan v. The Passaic Daily News, supra,* that "construction of the [Shield Law] permitting the deprivation of a party's right of cross-examination on vital issues of his cause of action could create constitutional difficulty or infirmity." 22 *N.J.* at 154. We agree that any plaintiff whose constitutionally protected interest has been damaged cannot be barred from proving that his rights have been violated. *See Boiardo, supra; Farber, supra.*

■ Applied to non-constitutional interests, however, plaintiff's argument would work to eliminate all statutory testimonial privileges. We have sustained testimonial privileges, even at the cost of denying a party information possibly vital to his action, "because in the particular area concerned, they are regarded as serving a more important public interest than the need for full disclosure." *State v. Briley,* 53 *N.J.* at 506. In *Cashen v. Spann,* 66 *N.J.* 541, 556 (1975), *cert. den.* 423 *U.S.* 829, 96 *S.Ct.* 48, 46 *L.Ed.2d* 46 (1975), the Court "emphasize[d] that in civil cases in which disclosure is sought ... for the purpose of asserting claims for money damages, the interests of the State in maintaining ... confidentiality ... are entitled to a greater degree of respect." Federal courts have also noted that plaintiffs in civil actions do not have a compelling interest in obtaining confidential information. *See, e.g., Baker v. F. & F. Investment,* 470 *F.2d* 778, 785 (2d Cir. 1972), *cert. den.,* 411 *U.S.* 966, 93 *S.Ct.* 2147, 36 *L.Ed.2d* 686 (1973); *Democratic National Committee v. McCord,* 356 *F.Supp.* 1394 (D.D.C.1973).

In this case, however, we need not evaluate plaintiff's interest in compelling disclosure, other than to affirm that it does not reach constitutional dimensions. The newsperson's privilege contains no limiting language. *Compare N.J.S.A.* 2A:84A–21 *with N.J.S.A.* 2A:84A–28(b) (limiting language found in inform-

er's privilege). The Legislature has already balanced the interests and concluded that the newsperson's privilege shall prevail. Since a plaintiff in a defamation action has no overriding constitutional interest at stake, the newsperson's privilege is absolute in libel cases.[8]

## IV

Because the newsperson's privilege asserted by defendants is absolute, plaintiff's motion to compel discovery of sources and editorial processes must fail unless defendants have waived the privilege. Relying on *Brogan v. The Passaic Daily News, supra,* plaintiff argues that the defendants have waived their Shield Law protection by partial disclosure and by the assertion of affirmative defenses, including truth, fair comment, good faith, honest belief and lack of malice. We hold that because of changes in the Shield Law and in the constitutional protection of libel defendants since *Brogan,* partial disclosure or the assertion of affirmative defenses no longer constitutes a waiver of the Shield Law privilege. Waiver under the Shield Law operates only as to those specific materials that are knowingly and voluntarily disclosed.

In arguing that defendants have waived their privilege, plaintiff points to the fact that defendant authors revealed that they based their article upon interviews with some 50 lobbyists, administrative officials, legislative liaisons, committee aides and Trenton journalists. This disclosure conceivably would have constituted a waiver before the 1977 Shield Law amendments, *see In re Bridge, supra.* The 1977 amendments, however, largely in response to the *Bridge* decision, tightened the requirements for waiver. The Legislature created separate privileges for sources and for information obtained in the course of pursuing professional activities. *N.J.S.A.* 2A:84A–21(a), (b). The privi-

---

[8]To the extent that *Brogan v. The Passaic Daily News, supra,* differs from this conclusion, it is overruled.

leges were intended to apply to every aspect of the news process. *Id.*

While the 1979 Shield Law amendments apply only to discovery requests by criminal defendants, the amendments give a clear indication of the Legislature's intent to narrow the scope of waiver in all proceedings. The 1979 amendments provide that "[p]ublication shall constitute a waiver only as to the specific materials published." *N.J.S.A.* 2A:84A–21.3(b), *L.* 1979, *c.* 479. In criminal proceedings, each piece of confidential information from a source, or about the source, must be separately considered for purposes of finding a waiver of the newsperson's privilege. It is inconceivable that the Legislature intended a broader view of waiver in civil matters, where the public interest in disclosure is less compelling. *See Cashen,* 66 *N.J.* at 556. We therefore hold that publication[9] of privileged information constitutes a waiver only as to that specific information. The waiver does not operate as to any non-disclosed information.

We recognize that the general provision on waiver, *Evid.R.* 37, still provides that "disclosure of any part of the privileged matter" constitutes a waiver. *L.* 1960, *c.* 52, *N.J.S.A.* 2A:84A–29. However, the specific waiver provisions in the Shield Law must prevail over the general waiver provision, particularly since the Shield Law provisions result from a more recent act of the Legislature. *See Brewer v. Porch,* 53 *N.J.* 167, 173 (1969); 2A Sands, Sutherland, *Statutory Construction* § 51.01 (4th ed. 1973). *See also In re Vrazo Subpoena,* 176 *N.J.Super.* 455 (Law Div. 1980) (disclosure of information does not waive privilege as to identity of source).

---

[9]We are giving "publication" its common usage in the law of libel, meaning communication to someone other than the plaintiff. Prosser, *Law of Torts, supra,* § 113 at 766. *Black's Law Dictionary* (4th ed. 1968). Communication to another newsperson entitled to invoke the privilege, however, would not constitute waiver.

The Shield Law would have little force if its thorough protection of confidential information could be so easily waived. Where, as here, defendants have steadfastly refused to divulge their sources and the editorial processes leading to publication of the allegedly libelous article, a finding of waiver must be rejected.

We therefore hold that defendants have not waived their Shield Law privilege. Since that privilege is absolute in the context of a libel action, plaintiff's motion to compel discovery must be denied.

## V

We pause here to add a note about the appropriate role of summary judgment in libel cases. Aside from the danger of a libel judgment and the intrusiveness of discovery of sources and editorial process, the cost of defending a libel action can itself deter free press.

The desultory pace of this three-year-old litigation gives little comfort to those who would assert their constitutional right to free speech about public affairs. This is especially true of the many smaller journals and local newspapers which have played an important role in the affairs of New Jersey but which cannot withstand high litigation costs. Our courts should resolve free speech litigation more expeditiously whenever possible. The perpetuation of meritless actions, with their attendant costs, chills the exercise of press freedom. To avoid this, trial courts should not hesitate to use summary judgment procedures where appropriate to bring such actions to a speedy end. *See Kotlikoff v. The Community News*, 89 *N.J.* 142 (1982); *Anderson v. Stanco Sports Library, Inc.*, 542 *F.*2d 638, 641 (4 Cir. 1976); *Bon Air Hotel, Inc. v. Time, Inc.*, 426 *F.*2d 858, 864–65 (5 Cir. 1970); *Washington Post Co. v. Keogh*, 365 *F.*2d 965, 968 (D.C.Cir.1966), *cert.* denied, 385 *U.S.* 1011, 87 *S.Ct.* 708, 17 *L.Ed.* 2d 548 (1967); *Schuster v. U.S. News & World Report, Inc.*, 459 *F.Supp.* 973, 975 (D.Minn.1978), *aff'd*, 602 *F.*2d 850 (8.Cir. 1979);

*Cardillo v. Doubleday & Co.*, 366 *F.Supp.* 92, 94–95 (S.D.N.Y. 1973), aff'd, 518 *F.2d* 638 (2 Cir. 1975).[10]

■ ·Much of this case could have been disposed of by summary judgment. Most of the statements complained of by plaintiff here are obviously opinions, which under *New York Times v. Sullivan, supra,* and *Gertz v. Robert Welch, Inc.,* 418 *U.S.* 323, 94 *S.Ct.* 2997, 41 *L.Ed.2d* 789 (1974), are absolutely privileged.

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. [*Gertz v. Welch,* 418 *U.S.* at 339–40, 94 *S.Ct.* at 3006–07]

*See Kotlikoff v. Community News,* 89 *N.J.* at 68.

We need not determine here precisely which statements made in the article are privileged. At least a few·statements would survive summary judgment as allegations of fact. Nonetheless, an early paring of plaintiff's claims is appropriate. It would isolate precisely what is at issue, help determine the scope of the discovery needed by the parties and clarify for defendant what it must prove to assert the defense of truth. All of these factors will tend to reduce the costs incurred by defendants here, and by libel defendants as a group, thereby diminishing the threat that

---

[10]In libel actions, summary judgment may be more appropriate on some issues than on others. We have said that trial courts should not hesitate to grant summary judgment for defendant in cases of privileged expressions of opinion. However, summary judgment poses a more difficult problem where the issue is whether a defendant has published a defamatory falsehood with actual malice. As the United States Supreme Court has cautioned, the issue of a defendant's state of mind "does not readily lend itself to summary disposition." *Hutchinson v. Proxmire,* 443 *U.S.* 111, 120 n.9, 99 *S.Ct.* 2675, 2680 n.9, 61 *L.Ed.2d* 411 (1979). As noted, a public figure must prove that the libel was published with actual malice. *New York Times Co. v. Sullivan,* 376 *U.S.* at 279–80, 84 *S.Ct.* at 725–26. Furthermore, that proof must be "clear and convincing". *Gertz v. Robert Welch, Inc.,* 418 *U.S.* 323, 342, 94 *S.Ct.* 2997, 3008, 41 *L.Ed.2d* 789 (1974). Courts should carefully examine the circumstances surrounding publication of defamatory allegations of fact to determine whether the issue of actual malice should go to the jury. *See infra,* at 198–200.

libel actions pose to aggressive journalism. The media should not be forced to engage in self-censorship for fear of the expense of defending against frivolous challenges to its editorial judgments. *See New York Times*, 376 *U.S.* at 279, 84 *S.Ct.* at 725; *Steaks Unlimited, Inc. v. Deaner*, 623 *F.*2d at 280 n.76.

The Shield Law privilege may burden some libel plaintiffs who will not survive a summary judgment motion without discovery. It would be unfortunate if some newspersons fabricated malicious lies and then claimed immunity from liability by claiming that they relied in good faith on a confidential source whose identity they decline to reveal. Contrary to states without a Shield Law, in New Jersey a media defendant's refusal to name its source cannot support an inference that no source existed. *Cf., Downing v. Monitor Publishing Co.*, 120 *N.H.* 383, 387, 415 *A.*2d 683, 686 (1980) (creating a presumption to that effect in the absence of a statutory privilege). However, similar burdens have attended the entire expansion of constitutional protection for libel defendants, beginning with *New York Times v. Sullivan.* This Constitutional protection

> administers an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander. And it exacts a correspondingly high price from the victims of defamatory falsehood. Plainly many deserving plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the *New York Times* test. Despite this substantial abridgment of the state law right to compensation for wrongful hurt to one's reputation, the Court has concluded that the protection of the New York Times privilege should be available.... [*Gertz v. Welch*, 418 *U.S.* at 342–43, 94 *S.Ct.* at 3008]

The New Jersey Shield Law does not entirely foreclose any prospective plaintiff's right to maintain a cause of action. An absolute Shield Law privilege gives newspersons less than absolute immunity from suit. In some circumstances, public figures will be able to establish by inferential evidence the recklessness necessary to sustain a libel judgment. When a plaintiff can show that a defamatory report was published, and the author claims reliance solely on confidential sources, the trial

court should consider whether the circumstances surrounding the publication warrant submission of the question of actual malice to the jury. The defendant in such cases, although under no legal duty to reveal its sources, may decide to do so to rebut an inferential showing of actual malice.

"Actual malice" does not mean that the defamatory falsehood was published with ill will, but rather that the statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 *U.S.* at 279–80, 84 *S.Ct.* at 725–26. Reckless disregard for the truth may appear when a published report

> is based solely on an unverified anonymous telephone call ... [or] when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. [*St. Amant v. Thompson*, 390 *U.S.* 727, 732, 88 *S.Ct.* 1323, 1326, 20 *L.Ed.*2d 262 (1968) (footnote omitted)]

A finding of actual malice may not be based solely on the character of the published statement. *Washington Post Co. v. Keogh*, 365 *F.*2d at 970. Nor may it be based solely on the publisher's failure to seek independent verification of the information. *St. Amant v. Thompson*, 390 *U.S.* at 731, 88 *S.Ct.* at 1325. The two in combination, however, may support a conclusion of recklessness. Public figure libel plaintiffs can recover for

> a defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers. [*Curtis Publishing Co. v. Butts*, 388 *U.S.* 130, 155, 87 *S.Ct.* 1975, 1991, 18 *L.Ed.*2d 1094, reh. den., 389 *U.S.* 889, 88 *S.Ct.* 11, 19 *L.Ed.* 2d 197 (1967) (holding it reckless to allege that respondent football coach "fixed" a game when defendant publication failed to investigate reports that allegation was false)]

Thus, an inference of actual malice may arise when a false report is published solely in reliance on confidential sources if (1) the content of the report is such as to be defamatory as a matter of law, (2) the defendant knew or should have known of some

reasonable means of verifying its accuracy, and (3) the failure to verify rises to the level of a gross violation of the standards of responsible journalism.[11] If the recklessness approaches the level of publishing a knowing, calculated falsehood, the decision whether the defendant acted with reckless disregard for the truth should be submitted to the jury. *See Lawrence v. Bauer Publishing & Printing*, 89 *N.J.* 451 at 466–467 (1982).

## VI

We recognize that our holding may be unfair to certain defamed individuals who cannot meet the difficult burden of proving reckless falsehood without discovery. But the Legislature has determined that the competing interest in a free press outweighs the possibility of damaged reputations. Since defamation is a common law action without a constitutional foundation, the Legislature has the power to limit that action in favor of the right of freedom of press.

Our Constitution grants the press wide freedom because we believe that the public interest is served by an informed citizenry. Those responsible for informing the public can discharge their function best when they can publish without anyone looking over their shoulders. The media must meet stringent deadlines, and it is inevitable that they will occasionally publish an inaccurate statement. The State House is no place for the meek and thin-skinned. Sometimes published statements will hurt. Sometimes they will turn out to be untrue. Nevertheless, those regrettable consequences must yield to the need for an informed citizenry.

---

[11]Contrary to the dissent's assertion, *Post* at 210, failure to verify will often be provable without the necessity of discovery. In some cases, the defendant will indicate who was contacted to verify the claims made. In many other cases, it will be clear from the allegations made from whom verification would likely be sought. Here, for example, plaintiff could show whether defendant contacted the sergeant-at-arms of the Senate or the Legislative Ethics Committee to verify the factual allegations in defendant's article about their actions involving Senator Maressa.

When a Legislature protects a free press, it fortifies the foundations of our representative democracy. To permit government to restrain the press is to tempt government to act without restraint. A government that frees the press from restraining influences is a blessing without disguise. It fosters the criticism of official conduct that is necessary to make government responsive to citizens. That is why democracies do not punish inaccurate speech.

Justice Brandeis knew "that freedom to think as you will and to speak as you think are means indispensible to the discovery and spread of political truth; ... and that the fitting remedy for evil counsels is good ones." *Whitney v. California,* 274 *U.S.* 357, 375, 47 *S.Ct.* 641, 648, 71 *L.Ed.* 1095, 1105–06 (Brandeis, J., concurring). The remedy of libel judgments has a role in our democracy; it compensates individuals for their injured reputations. But only free expression can preserve a democratic nation. Money awards are a medium of financial recompense. But free speech is the national currency. Our legislators have advanced this country's goals by protecting the press even at the cost of reducing their own protection against its attack. Their action would have stirred the former president of this country who said that "were it left to me to decide whether we should have government without newspapers, or newspapers without a government, I should not hesitate a moment to prefer the latter." *The Life and Selected Writings of Thomas Jefferson* 411–12 (A. Koch & W. Peden, eds., 1944).

Every libel law and every law affecting libel actions, including the New Jersey Shield Law, must balance important competing interests. We in no way seek to minimize the individual's interest in protection of his or her good name, which "reflects no more than our basic concept of the essential dignity and worth of every human being," *Rosenblatt v. Baer,* 383 *U.S.* 75, 92, 86 *S.Ct.* 669, 679, 15 *L.Ed.2d* 597, 609 (1966) (Stewart, J., concurring). But the Legislature has weighed the competing interests in a free press and the individual interest in reputation. It has

chosen to give greater protection to freedom of speech, and our duty is to enforce that choice.[12]

We therefore hold that the Shield Law affords newspersons complete protection against disclosure of their confidential sources and the editorial processes leading to publication of an alleged libel. The order of the Superior Court, Law Division, is reversed, and the matter is remanded for further proceedings consistent with this opinion.

SCHREIBER, J., dissenting.

Article I, paragraph 6 of the New Jersey Constitution safeguards an individual's right to a cause of action for defamation.[1] It is of course subject to the Federal Constitution, the Supreme law of the land. As such this right has been abridged to some extent by the United States Supreme Court's interpretation of the First Amendment to the Federal Constitution. Other than that modification the cause of action for defamation cannot be eliminated by the Legislature. Yet the majority's interpretation

---

[12]In fact, it has been forcefully argued that any state law allowing recovery for defamatory falsehood violates the First and Fourteenth Amendments, if applied to speech about official action or public matters. *See New York Times*, 376 *U.S.* at 293, 295–96, 84 *S.Ct.* at 733, 734–35 (Black, J., concurring, joined by Douglas, J.) ("the First and Fourteenth Amendments . . . completely prohibit a state from exercising such a power . . . to impose damages for merely discussing public affairs and criticizing public officials. The power of the United States to do that is, in my judgment, precisely nil."); 376 *U.S.* at 297, 84 *S.Ct.* at 735 (Goldberg, J., concurring, joined by Douglas, J.) (arguing for absolute privilege to criticize public officials without fear of libel action). The position of these Justices and others finds support in recent reports of an increase in the use of libel actions to intimidate those who criticize public figures. *See, e.g.*, Pell, "Libel as a Political Weapon," *The Nation*, June 6, 1981.

[1]It is also arguable that the right of an individual to protect his or her good name is secured by the constitutional right of "enjoying and defending . . . liberty, of acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness." *N.J.Const.* (1947), Art. I, par. 1. I have chosen to rely on Article I, par. 6 which speaks directly to a cause of action based on defamation.

of the Shield Law, *N.J.S.A.* 2A:84A–21, has that precise effect in the case of public figures and public officials, despite the lip service it pays to society's interest in assuring that individuals enjoy their reputations unimpaired by false and defamatory attacks. Moreover, the language and sense of that Law do not justify that interpretation. It is for these reasons I must dissent.

I

A cause of action for defamation was well established in the common law. Reputation was a protectible interest and the courts were available to compensate the injured person for damages attributable to libelous or slanderous statements. See L. Eldredge, *The Law of Defamation* 293–94 (1978). As the press developed and actively participated in public affairs by printing articles and comments about individuals, it naturally became the target of those whose reputations suffered at its hands. Protection of the press became a desired goal by the time the Federal Constitution was adopted. Concern focused on the liberty to print whatever one had a mind to without being subjected to prior restraint. *See* L. Levy, *Freedom of Speech and Press in Early American History* 13–14 (1963). However, accompanying the freedom was a responsibility for disseminating libelous material. Indeed, the generally accepted rule of law was that libelous utterances were not constitutionally protected speech. *Beauharnais v. Illinois,* 343 *U.S.* 250, 266, 72 *S.Ct.* 725, 735, 96 *L.Ed.* 919, 932 (1952); *Roth v. United States,* 354 *U.S.* 476, 482–83, 77 *S.Ct.* 1304, 1307–08, 1 *L.Ed.*2d 1498, 1505–06 (1957).

This accommodation between a free press and its responsibility continued substantially unimpaired until *New York Times v. Sullivan,* 376 *U.S.* 254, 84 *S.Ct.* 710, 11 *L.Ed.*2d 686 (1964), when the Supreme Court sharply reduced the press's accountability for defamatory statements made about public officials. This standard was later extended to public figures. *Curtis Publish-*

*ing Co. v. Butts,* 388 *U.S.* 130, 87 *S.Ct.* 1975, 18 *L.Ed.*2d 1094 (1967). Those plaintiffs had to prove that the press knowingly printed false material or that its publication had been made with a reckless disregard for the truth. The latter element was refined in *St. Amant v. Thompson,* 390 *U.S.* 727, 88 *S.Ct.* 1323, 20 *L.Ed.*2d 262 (1968), which held that to show recklessness a plaintiff must introduce evidence "that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* at 731, 88 *S.Ct.* at 1325, 20 *L.Ed.*2d at 267.

A plaintiff, after the substantive change in libel law effected by *New York Times,* encountered the problem of securing the evidence to meet the new heightened test. Proof of the defendant's state of mind, regarding either actual knowledge or a reckless disregard of the truth, would in all probability have to be developed through the defendant and its employees. Such was the scene in *Herbert v. Lando,* 441 *U.S.* 153, 99 *S.Ct.* 1635, 60 *L.Ed.*2d 115 (1979).

In that case, plaintiff, a public figure, sued The Columbia Broadcasting System, Inc. (CBS), Lando, the producer of the CBS television show, and others for portraying him as a liar. Lando refused during the discovery process to answer questions involving his mental processes. These inquiries concerned (1) Lando's conclusions during his research and investigations about which leads to pursue, (2) his impressions of facts gathered from interviewees and his state of mind about their veracity, (3) the basis of his conclusions where he had reached a determination concerning the veracity of persons, information or events, (4) conversations with the coproducer about what should be included or excluded from the program, and (5) Lando's intentions as manifested by his editorial decisions. *Id.* at 157 n.2, 99 *S.Ct.* at 1639 n.2, 60 *L.Ed.*2d at 122 n.2.

The Court of Appeals for the Second Circuit concluded that because Lando's state of mind and editorial conversations were protected by an absolute constitutional privilege he need not respond to a discovery request. The United States Supreme

Court reversed. Justice White, writing for a majority, reasoned that damages for defamation did not abridge the freedom of press or free speech when the *New York Times* standard was met. *Id.* at 160, 172, 99 *S.Ct.* at 1640, 1646, 60 *L.Ed.*2d at 124, 131. Thus it was proper for a plaintiff to focus discovery on a defendant's thoughts and editorial processes. "[U]nless liability is to be completely foreclosed," the thoughts and editorial processes had to be open to examination. *Id.* at 160, 99 *S.Ct.* at 1640, 60 *L.Ed.*2d at 124.

Moreover, the *Herbert* Court reaffirmed the *New York Times* doctrine which balanced the freedom of the press and the "basic concern" for the individual's interest in his reputation. *Id.* at 169, 99 *S.Ct.* at 1645, 60 *L.Ed.*2d at 129. The Court reiterated that "there [was] no constitutional value in false statements of fact." *Id.* at 171, 99 *S.Ct.* at 1646, 60 *L.Ed.*2d at 131, quoting *Gertz v. Robert Welch, Inc.*, 418 *U.S.* 323, 340, 94 *S.Ct.* 2997, 41 *L.Ed.*2d 789, 805. Holding those who publish defamatory statements responsible compensates the injured and deters reckless publication of false statements. Thus *Herbert* acknowledges that broad discovery into editorial editing and processing is permissible under federal discovery rules 26(b)(1) and 26(c) and is not violative of freedom of the press protected by the First Amendment. 441 *U.S.* at 177, 99 *S.Ct.* at 1649, 60 *L.Ed.*2d at 134.

Insofar as the First Amendment is concerned, the Supreme Court has recognized that an individual's cause of action for defamation is abridged to the extent that public officials and public figures must prove actual malice as defined in *New York Times.* The Court recognized the importance of the press's freedom, but it rejected "complete immunity from liability from defamation" since that would be "an untenable construction of the First Amendment." *Id.* at 176, 99 *S.Ct.* at 1648, 60 *L.Ed.*2d at 134. Thus it concluded that foreclosing discovery of editorial processing would be going too far at the expense of the individual who had been injured by the defamatory statement. *See*

Franklin, "Reflections on *Herbert v. Lando*," 31 *Stanford L.Rev.* 1035 (1979).

## II

The Supreme Court acknowledged in *Paul v. Davis*, 424 *U.S.* 693, 96 *S.Ct.* 1155, 47 *L.Ed.*2d 405 (1976), that there was no federal constitutionally protected right for redress from defamation in the absence of an interest "vouchsafed to him by" a state. *Id.* at 712, 96 *S.Ct.* at 1166, 47 *L.Ed.*2d at 420. I find that such an interest exists in New Jersey.

It must be remembered that until the adoption of the Fourteenth Amendment in 1868, there was no federal restriction on state action affecting freedom of the press. The First Amendment to the Federal Constitution applied only to Congress and the authority to legislate on freedom of the press and causes of action for defamation was left to the states. *See* Levy, *Freedom of Speech and Press, supra*, at 235. Nine of the original states incorporated provisions protecting freedom of the press in their constitutions. Four did not. Even when the state constitutions included protection for the press, it was unquestioned "that the common-law rules that subjected the libeler to responsibility for the private injury, . . . occasioned by his conduct [was] not abolished by the protection extended to the press in [the] constitutions." 2 Cooley, *Constitutional Limitations* 883 (8th ed. Carrington 1927).

For example, article sixteen of the Massachusetts Constitution declared that the "liberty of the press is essential to the security of freedom in a State; it ought not therefore to be restrained in this Commonwealth." Yet, Chief Justice Parker declared in *Commonwealth v. Blanding*, 20 *Mass.* 304, 313 (1825), that this liberty was subject to a provision in article eleven that "every subject of the Commonwealth ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property, or character."

Originally, New Jersey had no constitutional provision regarding freedom of the press. Common law actions for libel or slander were cognizable. *Cf. McCuen v. Ludlum*, 17 *N.J.L.* 12 (Sup.Ct.1839). The 1844 Constitution contained a bill of rights in Article I, and paragraph 5 of that Article provided:

> Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press. In all prosecutions or indictments for libel, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

This language was carried over into our present Constitution. See *N.J.Const.* (1947), Art. I, par. 6.

The Proceedings of the Constitutional Convention of 1844 reveal that the press paragraph was copied from Article VII, section 8 of the New York Constitution of 1821. 2 *New Jersey Writers' Project* 144 (1942). The constitutional convention proceedings in New York and in New Jersey contain no reference to the first sentence in paragraph 5 relating to a person's right to freely speak, write and publish subject to "being responsible for the abuse of that right."

However, that thought had been expressed similarly by others. Blackstone had stated: "Thus the will of individuals is still left free; the abuse only of that free-will is the object of legal punishment." 4 W. Blackstone, *Commentaries* 154 (4th Cooley ed. J. Andrews 1899). Lord Mansfield in *King v. The Dean of St. Asaph*, 3 *TR* 657, 661 (1784), had written: "The liberty of the press consists in printing without any previous license, subject to the consequence of law." Lord Kenyon in *King v. Cuthell*, 27 *Howell St. Tr.* 675 stated "that a man may publish anything which ... is not blameable, but that he ought to be punished if he publishes that which is blameable." Odgers in his treatise on libel wrote: "Any man is free to speak or to write and publish whatever he chooses of another, subject only to this, that he must take the consequences, should a jury deem his words defamatory. This is what is meant by 'the liberty of the

press.'" W. Odgers, *A Digest of the Law of Libel and Slander* 11 (1st Am. ed. Bigelow 1881). Chief Justice Parker in *Commonwealth* explained: "The liberty of the press was to be unrestrained, but he who used it was to be responsible in case of its abuse...." *Commonwealth v. Blanding*, 20 *Mass.* at 311.

Language comparable to the several above quotations was inserted in the New York and New Jersey Constitutions. This terminology acknowledges the press's responsibility for abusing its right to write and publish. The sense of the words is to protect those who would be defamed by irresponsible utterances.

This interpretation of Article I, paragraph 6 has been accepted by those courts which have reflected on it. In *Leers v. Green*, 24 *N.J.* 239 (1956), Justice Heher commented:

> In this [statement in the Constitution] we have the very essence of the freedom of speech and of press secured by the 1947 State Constitution, Article I, paragraph 6, holding the actor "responsible for the abuse of that right," (derived from the 1844 Constitution, Article I, paragraph 5) and also by the First Amendment to the Federal Constitution. [*Id.* at 254]

Sprinkled throughout our reports are other comments reflecting the substantive constitutional protection afforded the individual when the freedom of speaking, writing and publishing has been abused. *See, e.g., State v. Boyd*, 86 *N.J.L.* 75, 79 (Sup.Ct.1914) ("language tending to the violation of the rights of personal security and private property and toward breaches of the public peace is an abuse of the right of free speech for which by the very constitutional language invoked, the utterer is responsible"); *Coleman v. Newark Morning Ledger Co.*, 29 *N.J.* 357, 379 (1959) (reaffirming language of *Leers*).

The people of New Jersey have carefully guarded the individual's right to damages for libelous statements. The Legislature has not abolished a cause of action for public figures or officials and I submit that it could not do so since the cause of action is constitutionally protected. The majority interprets the Shield Law, *N.J.S.A.* 2A:84A–21, to provide that the newsperson's statutory privilege covers the source, the information (whether

disseminated or not) and editorial processes. As a result, in most cases a plaintiff's ability to develop evidence relevant to the state of mind of the defendant will have been eliminated and thereby his constitutionally protected cause of action will have been obliterated.

Justice White commented in *Herbert* on the far-reaching effect of precluding a plaintiff from utilizing discovery with respect to editorial processing. He observed that by placing beyond plaintiff's reach a range of direct evidence relevant to providing knowing or reckless falsehood by the publisher of an alleged libel, elements critical to plaintiffs may not be proven. He noted that foreclosing discovery of editorial processes would erect "an impenetrable barrier to the plaintiff's use of such evidence" and "is a matter of some substance, particularly when defendants themselves are prone to assert their good-faith belief in the truth of their publications, and libel plaintiffs are required to prove knowing or reckless falsehood with 'convincing clarity.'" 441 *U.S.* at 170, 99 *S.Ct.* at 1645, 60 *L.Ed.*2d at 130. The majority asserts that the plaintiff may prove recklessness by showing that the publisher failed to seek independent verification of serious charges. However, the difficulty is that the plaintiff will not be able to prove the necessary ingredients. The reporter need not disclose the source, need not disclose his method of verification, need not disclose the identities of the verifiers, if any, need not explain why he considered the sources responsible, and need not disclose his editorial processing in whole or in part. A reporter, refusing to divulge any of this information, may comfortably rely on the assertion that his source, albeit only one, was reliable, thereby leading to the termination of the proceeding. *See Edwards v. National Audubon Society, Inc.*, 556 *F.*2d 113, 120 (2d Cir. 1977). An interpretation of the Shield Law which does what the Supreme Court in *Herbert* refused to do effectively eliminates a public official's or

public figure's[2] cause of action for defamation and conflicts with the state constitutional protection given to those individuals who have been wrongly and intolerably damaged by the "abuse of the right" of freedom of the press.

·However, this interpretation of the Shield Law is not necessary or warranted. The statute reads as follows:

> Subject to Rule 37, a person engaged on, engaged in, connected with, or employed by news media for the purpose of gathering, procuring, transmitting, compiling, editing or disseminating news for the general public or on whose behalf news is so gathered, procured, transmitted, compiled, edited or disseminated has a privilege to refuse to disclose, in any legal or quasi-legal proceeding or before any investigative body, including, but not limited to, any court, grand jury, petit jury, administrative agency, the Legislature or legislative committee, or elsewhere.
>
> a. The source, author, means, agency or person from or through whom any information was procured, obtained, supplied, furnished, gathered, transmitted, compiled, edited, disseminated or delivered; and
>
> b. Any news or information obtained in the course of pursuing his professional activities whether or not it is disseminated. [*L.* 1977, *c.* 253, § 1, eff. Oct. 5, 1977; *N.J.S.A.* 2A:84A–21]

A careful reading of the statute indicates that the key to subdivision (a) is the identity of the third person who acted as a conduit of the information. The statute focuses on that identification, not on what the defendant newsreporter may do with the information. Subsection (a) does *not* refer to the defendant newspaper person's editorial processes. It does *not* refer to *his* impressions of the facts gathered, *his* conclusions of their veracity, or *his* intentions as manifested by his editorial decisions.

In addition to the fact that the language of the statute does not support the interpretation placed upon it by the majority, the legislative history contains no suggestion that the Legislature intended to foreclose discovery into the defendant's editorial processing. I do not believe the Legislature intended to adopt the "stunning" proposition that the defendant has an absolute privilege to resist the most direct form of inquiry into the

---

[2]The broad definition of a "public figure," *Lawrence v. Bauer Publishing & Printing,* 89 *N.J.* 451, 463–65 (1982), makes the constitutional violation even more egregious.

precise matter the plaintiff is required to prove with "convincing clarity." *See* Comment, *"Herbert v. Lando*: Reporter's Privilege From Revealing the Editorial Process in a Defamation Suit," 78 *Colum.L.Rev.* 448, 453 (1978). As Justice Brennan in his dissenting opinion in *Herbert v. Lando* observed: "It would be anomalous to turn substantive liability on a journalist's subjective attitude and at the same time to shield from disclosure the most direct evidence of that attitude." 441 *U.S.* at 192, 99 *S.Ct.* at 1657, 60 *L.Ed.*2d at 144. If there be any guide it is that the Legislature is aware of the principle that evidentiary privileges are not favored, precluding as they do a "rational means for ascertaining truth." *Elkins v. United States*, 364 *U.S.* 206, 234, 80 *S.Ct.* 1437, 1454, 4 *L.Ed.*2d 1669, 1695 (1960) (Frankfurter, J., dissenting). *See also United States v. Nixon*, 418 *U.S.* 683, 94 *S.Ct.* 3090, 41 *L.Ed.*2d 1039 (1974); 8 *Wigmore, Evidence* § 2192 (McNaughton rev. 1961).

The majority asserts that occupants of the State House, including members of the state Legislature, should not be "meek and thin-skinned." Yet it is more than the meek and thin-skinned who may refuse public office rather than expose themselves to possible public contempt and ridicule by an irresponsible reporter. Apparently persons within these categories should henceforth disqualify themselves from accepting any public office. Even more devastating is the fact that the *Maressa* doctrine will be applied to ordinary citizens attempting to voice their views in town meetings. *See Lawrence v. Bauer Publishing & Printing*, 89 *N.J.* 451, 474–75 (1982) (Schreiber, J., dissenting).

I would affirm the trial court's order that defendants respond to those interrogatories and depositions addressed to their respective editorial processes.

*For reversal and remandment*—Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, HANDLER, POLLOCK and O'HERN—6.

*For affirmance*—Justice SCHREIBER—1.